WISCONSIN LABOR RELATIONS BOARD, Respondent, vs. FRED RUEPING LEATHER COMPANY, Appellant.

*April 13—June 25, 1938.*

474

For the appellant there were briefs by *Lines, Spooner & Quarles*, attorneys, and *Leo Mann* and *James T. Guy* of counsel, all of Milwaukee, and oral argument by *Charles B. Quarles*.

The *Attorney General* and *N. P. Feinsinger* and *William G. Rice, Jr.,* special counsel, for the respondent.

Briefs were also filed by *Joseph A. Padway* of Milwaukee, general counsel for the Wisconsin State Federation of Labor, and by *Burton A. Zorn* and *Eugene Cotton,* both of New York City, on behalf of the New York State Labor Relations Board, as *amici curiæ*.

The following opinion was filed May 17, 1938:

WICKHEM, J. On June 8, 1937, plaintiff, hereinafter called the "Wisconsin board," caused a complaint to be served upon defendant at the request of the Textile Workers Organizing Committee of the Committee for Industrial Organization and the Amalgamated Clothing Workers of America, a branch of the Committee for Industrial Organization, charging that defendant had interfered with, restrained, and coerced employees in the exercise of their rights of self-organization to prevent employees of defendant from bargaining collectively as provided in secs. 111.07 and 111.08 (1) of the Wisconsin Labor Relations Act; that defendant initiated a company union and contributed financial support thereto; that defendant discriminated in respect to hire or terms of tenure or other conditions of employment to discourage membership in the Committee for Industrial Organization and encourage membership in the company union; that defendant discharged one Richard Assaf because of activities on behalf of the Committee for Industrial Organization and to discourage membership in that organization; that it discriminated against Gilbert Andrews for similar reasons and has threatened others of its

employees with discharge if they joined or retained membership in the Committee for Industrial Organization; that defendant secured one Lawrence Comins to act in its behalf to keep under surveillance activities of the Committee for Industrial Organization; and that defendant, by its officers and agents, spied upon the activities and meetings of the employees; and that each of the foregoing constituted unfair labor practice. Over defendant's objection to the jurisdiction of the Wisconsin board, the board proceeded to consider the merits of the charges and filed findings of fact, which for the moment may simply be characterized as sustaining the charges. The order appealed from directs the defendant to cease and desist, (1) from interfering with the organizational rights of employees, and (2) from discouraging membership in outside unions. The order also requires defendant to take the following affirmative action: (1) Post notices stating, (a) that defendant will cease and desist in accordance with the above portion of the order; and (b) that its employees are free to join any *bona fide* employee organization formed for collective bargaining, and that their status as employees will not be affected by such action; (2) restore Richard Assaf to his employment and pay him the sum he would have earned but for his discharge, less the amount he may have earned in other employment between the date of discharge and the date of re-employment; and (3) notify the board in writing on or before August 19, 1937, the steps defendant has taken to comply with the order. On August 14, 1937, defendant commenced an action in the United States district court for the Eastern district of Wisconsin against the Wisconsin board praying that the board be enjoined from further proceedings against defendant to enforce its order. Section 266 of the Judicial Code (28 USCA, § 380) provides that if before final hearing of an application for an injunction to restrain the

enforcement of any state statute or the execution of any order made by an administrative board acting under a state statute, a suit shall have been begun in the state court to enforce such statute or order accompanied by a stay of such order under the state statute pending the determination of such suit in the state court, all proceedings to restrain the execution of the statute brought in any court of the United States shall be stayed. This action to enforce the order of the Wisconsin board was brought in the circuit court for Dane county on August 28, 1937, and that court entered an order staying the enforcement of the order. This was followed by a stay of proceedings in the federal court. This action then proceeded to judgment as heretofore noted.

The principal contention of defendant is that the National Labor Relations Act (29 USCA, § 151 *et seq.*) applies to defendant, covers the same ground as the Wisconsin Labor Relations Act (sec. 111.01 *et seq.*, Wis. Stats.), and completely covers the field of labor relations of corporations engaged in interstate commerce; that it supersedes the state act; and that the Wisconsin board had no jurisdiction to enter the order which it seeks to enforce. There is no contention that defendant, the business of which is largely in interstate commerce, is not subject to the national act, and the sole question is whether the National Labor Relations Act excludes application of the Wisconsin act to unfair labor practices so affecting interstate commerce as to bring them within the operation of the national act. It is evident that the enactment of the National Labor Relations Act cannot and does not supersede the Wisconsin act as to labor relations which do not so affect interstate commerce as to bring them within the commerce clause. As to such relations, the police power of the state of Wisconsin remains unimpaired, and it is beyond the competency of congress to impair it. Any concessions in this direction would mean the end of the

federal system. In the case of *National Labor Relations Board v. Jones & Laughlin Steel Corp.* 301 U. S. 1, 29, 57 Sup. Ct. 615, 81 L. Ed. 893, the National Labor Relations Act was challenged as an attempt to regulate industry, thus invading the reserved powers of the states over their local concerns. It was stated by the court:

"If this conception of terms, intent and consequent inseparability were sound, the act would necessarily fall by reason of the limitation upon the federal power which inheres in the constitutional grant, as well as because of the explicit reservation of the Tenth amendment. . . . The authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several states' and the internal concerns of a state. That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system."

The power of the state of Wisconsin to subject labor relations to regulation is based upon the police power; that of the federal government to deal with the same subject is grounded upon and limited by the commerce clause, and is sustained upon the theory that strikes, boycotts, and other disturbances arising from labor disputes in industries engaged in interstate commerce so proximately obstruct and burden interstate commerce as to bring labor relations in such industries within the power of congress. In the *Jones & Laughlin Case, supra,* it was said (p. 36):

"The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a 'flow' of interstate or foreign commerce. Burdens and obstructions may be due to injurious action springing from other sources. The fundamental principle is that the power to regulate commerce is the power to enact 'all appropriate legislation' for 'its protection and advancement.'"

The state may, therefore, regulate labor relations in the interests of the peace, health, and order of the state, and the federal government may regulate this relationship to the extent that unregulated it tends to obstruct or burden interstate commerce.   Obviously, a possibility of conflict between these powers exists only as to the portion of the field with which congress has competency to deal.   In the absence of a federal statute either dealing with or pre-empting this field, the police power of the state has full operation, provided no undue or discriminatory burdens are put upon interstate commerce.

In *South Carolina State Highway Dept. v. Barnwell Bros.* 303 U. S. 177, 184, 58 Sup. Ct. 510, 82 L. Ed. 000, the court, speaking through Mr. Justice STONE, states:

"While the constitutional grant to congress of power to regulate interstate commerce has been held to operate of its own force to curtail state power in some measure, it did not forestall all state action affecting interstate commerce. Ever since *Willson v. Black Bird Creek Marsh Co.* 2 Pet. 245, 7 L. Ed. 412, and *Cooley v. Board of Port Wardens,* 12 How. 299, 13 L. Ed. 996, it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce but which, because of their local character and their number and diversity, may never be fully dealt with by congress.   Notwithstanding the commerce clause, such regulation in the absence of congressional action has for the most part been left to the states by the decisions of this court, subject to the other applicable constitutional restraints.

"The commerce clause by its own force, prohibits discrimination against interstate commerce, whatever its form or method, and the decisions of this court have recognized that there is scope for its like operation when state legislation nominally of local concern is in point of fact aimed at interstate commerce, or by its necessary operation is a means of gaining a local benefit by throwing the attendant burdens on those without the state. . . ."

See also *Second Employers' Liability Cases*, 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327; *Port Richmond Ferry v. Hudson County*, 234 U. S. 317, 34 Sup. Ct. 821, 58 L. Ed. 1330; *Oregon-Washington R. & N. Co. v. Washington*, 270 U. S. 87, 46 Sup. Ct. 279, 70 L. Ed. 482; *Savage v. Jones*, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182; *Southern R. Co. v. Reid*, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257; *Minnesota Rate Cases*, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511.

This doctrine finds implied support from the following cases holding that when congress has pre-empted the field, the power of the state with respect to interstate commerce terminates: *New York Central R. Co. v. Winfield*, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045; *Minnesota Rate Cases, supra; Napier v. Atlantic Coast Line R. Co.* 272 U. S. 605, 47 Sup. Ct. 207, 71 L. Ed. 432; *Erie R. Co. v. New York*, 233 U. S. 671, 34 Sup. Ct. 756, 58 L. Ed. 1149; *Reid v. Colorado*, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108; *Southern R. Co. v. Reid, supra; Northern Pacific R. Co. v. Washington*, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237; *Oregon-Washington R. & N. Co. v. Washington, supra; Pennsylvania R. Co. v. Public Service Comm.* 250 U. S. 566, 40 Sup. Ct. 36, 63 L. Ed. 1142; and *Chicago, R. I. & P. R. Co. v. Hardwick Elevator Co.* 226 U. S. 426, 33 Sup. Ct. 174, 57 L. Ed. 284.

It is not seriously contended that the Wisconsin act, which is conceded to be nearly identical both in purpose and method with the national act, discriminates against or unduly burdens interstate commerce. The conclusion is inevitable that it constituted a valid exercise of the police power of this state, even as to those labor relationships which fall within the commerce clause, unless the national act has excluded its operation in this field. That congress, if it clearly evidences such an intention may, with respect to matters

falling within its powers under the commerce clause, completely exclude the operation of existing or subsequently-enacted state statutes which in the exercise of the police power purport to regulate this field, is not open to question. *New York Central R. Co. v. Winfield, supra; Minnesota Rate Cases, supra; Napier v. Atlantic Coast Line R. Co., supra; Erie R. Co. v. New York, supra; Reid v. Colorado, supra; Southern R. Co. v. Reid, supra; Northern Pacific R. Co. v. Washington, supra; Oregon-Washington R. & N. Co. v. Washington, supra; Pennsylvania R. Co. v. Public Service Comm., supra;* and *Chicago, R. I. & P. R. Co. v. Hardwick Elevator Co., supra.*

It is equally well established, however, that the intention of congress to exclude states from exercising their police power must be clearly manifested. *Reid v. Colorado, supra; Savage v. Jones, supra; Napier v. Atlantic Coast Line R. Co., supra; Mintz v. Baldwin,* 289 U. S. 346, 53 Sup. Ct. 611, 77 L. Ed. 1245; *Carey v. South Dakota,* 250 U. S. 118, 39 Sup. Ct. 403, 63 L. Ed. 886; *Kelly v. Washington,* 302 U. S. 1, 10, 58 Sup. Ct. 87, 82 L. Ed. 000. In the latter case the court said:

"The principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.' "

We conclude that the Wisconsin act must be held effective as an exercise of the police power even in labor relations involving interstate commerce unless the National Labor Relations Act has clearly evidenced an intention to supersede state legislation in this field.

Defendant contends that the legislative intent to exclude or supersede state legislation in the field is evidenced, (1) by section 10 (a) of the act (29 USCA, § 160 (a)); (2) by

the fact that the act contains no saving clause; and (3) by the fact that the federal act is identical with the state act, and covers the subject completely. In considering the argument based upon section 10 (a) of the National Labor Relations Act, it is convenient first to set forth the provisions of this section.

"The board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."

At first sight this appears to furnish strong support for defendant's argument. We are satisfied, however, that the argument is without merit. This section purports to deal not with the scope of the act, but with the powers and jurisdiction of the National Labor Relations Board with respect to its administration. Its purpose is therefore presumably to establish the exclusive character of the board's powers of administration as contrasted with other federal boards and agencies which might otherwise be thought to have like jurisdiction. For this reason one would not normally look to section 10 (a) for any exposition of the intended scope and superseding effect of the act. Section 14 of the act (29 USCA, § 164) strongly fortifies this conclusion. This section reads:

"Wherever the application of the provisions of section 7 (a) of the National Industrial Recovery Act (U. S. C., Supp. VII, title 15, section 707 (a)), as amended from time to time, or of section 77B, paragraphs (l) and (m) of the act approved June 7, 1934, entitled 'An act to amend an act entitled "An act to establish a uniform system of bankruptcy throughout the United States," approved July 1, 1898, and acts amendatory thereof and supplementary thereto' (48 Stat. 922, pars. (l) and (m)), as amended

from time to time, or of Public Resolution Numbered 44, approved June 19, 1934 (48 Stat. 1183), conflicts with the application of the provisions of this act, this act shall prevail: Provided, that in any situation where the provisions of this act cannot be validly enforced, the provisions of such other acts shall remain in full force and effect."

It is this section in which the scope of the act in its relation to other federal enactments is defined, and, taken in connection with section 10 (a), it is evident that the concern of congress in enacting section 10 (a) was to avoid any conflict between the administrative power of the National Labor Relations Board and the several agencies engaged in administering other federal acts touching the same subject, leaving to section 14 the establishment of the scope of the National Labor Relations Act in relation to conflicting provisions of other federal acts. The combined effect of the sections was to establish the supremacy of the National Labor Relations Act over all conflicting acts and to vest exclusive administration of it in the National Labor Relations Board.

Some support for this conclusion is to be found in *Myers v. Bethlehem Shipbuilding Corp.* 303 U. S. 41, 58 Sup. Ct. 459, 82 L. Ed. 000. In this case it was held that the federal district court had no jurisdiction to enjoin the National Labor Relations Board from holding hearings on a complaint filed by the board against plaintiff company. In reply to plaintiff's contention that, since the company denied that interstate or foreign commerce was involved, rights guaranteed to it by the federal constitution would be denied unless it be held that the district court had jurisdiction to enjoin the holding of a hearing by the board, the court said (p. 50):

"So to hold would, as the government insists, in effect substitute the district court for the board as the tribunal to hear and determine what congress declared the board exclusively should hear and determine in the first instance. The

contention is at war with the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."

See also *Newport News Shipbuilding & Dry Dock Co. v. Schauffler,* 303 U. S. 54, 58 Sup. Ct. 466, 82 L. Ed. 000.

While not addressed to the question which we are considering, it is evident that the court in the *Myers Case* treated section 10 (a) simply as prescribing an exclusive administrative remedy which must be exhausted before any judicial remedy is invoked. That being the effect of the section, it can hardly be argued that it defines the scope of the act in its relation to the police power of a state.

Subsection (3) of section 8 (29 USCA, § 158 (3)) provides in part:

"By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, that nothing in this act or in the National Industrial Recovery Act (U. S. C., Supp. VII, title 15, sections 701–712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization. . . ."

This section, considered in connection with section 14, answers defendant's subsidiary contention based on the broad scope of the concluding language of section 10 (a). It is contended that the statement in section 10 (a) that the board's power "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise" is so sweeping as to include and supersede state laws upon the subject. If the language be literally construed and considered apart from the act as a whole, the contention would be difficult to meet. But starting with the premise that the section appar-

ently deals with powers of the board and not with the scope of the act, sections 14 and 8 indicate quite plainly what agreements, codes, and other laws are intended to be referred to by its concluding language.

The contention that the act contains no saving clause applicable to state laws dealing with the same general subject matter is next asserted. This circumstance is entitled to considerably diminished weight in view of the fact that at the time the national act was passed there were no state laws of similar character. Aside from this, the contention is one that seems impossible to reconcile with the rule requiring a clear manifestation by congress of an intent to exclude exercise of the state police power. To concede its validity would involve creation of a rule that the intention of congress not to supersede must be contained expressly in the national act.

The contention that the completeness with which congress has covered the field of labor relations in the National Labor Relations Act compels the conclusion that it intended to pre-empt the field and to supersede state legislation therein offers some difficulty. We are cited to statement in opinions which would appear to treat the circumstance as quite conclusive. In the *Second Employers' Liability Cases,* 223 U. S. 1, 55, 32 Sup. Ct. 169, 56 L. Ed. 327, it is said:

"And now that congress has acted, the laws of the states, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is."

In *Adams Express Co. v. Croninger,* 226 U. S. 491, 505, 33 Sup. Ct. 148, 57 L. Ed. 314, the court said:

"Almost every detail of the subject is covered so completely that there can be no rational doubt but that congress intended to take possession of the subject and supersede all state regulation with reference to it."

We shall make no effort to consider separately all cases which have treated the detail and completeness of an enact-

ment by congress as evidence of an intent exclusively to regulate the field and to exclude state legislation. At the outset it is important to keep in mind that this is not a rule of law but the basis for inferring a legislative intent. It is doubtless true that when congress enacts a measure of great scope and detail within the field of its competency, the completeness of the coverage standing alone is substantial evidence of an intent to exclude state legislation upon the subject. The strength of the inference, however, will vary according to the circumstances. In cases where the subject matter of the legislation relates to direct instrumentalities of interstate commerce, such as railroads, the mere dealing with the subject may give rise to the nearly or quite conclusive inference of an intent to supersede state legislation. *Erie R. Co. v. New York,* 233 U. S. 671, 34 Sup. Ct. 756, 58 L. Ed. 1149; *Southern R. Co. v. Reid,* 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257; *Pennsylvania R. Co. v. Public Service Comm.* 250 U. S. 566, 40 Sup. Ct. 36, 63 L. Ed. 1142; *Chicago, R. I. & P. R. Co. v. Hardwick Elevator Co.* 226 U. S. 426, 33 Sup. Ct. 174, 57 L. Ed. 284; *Second Employers' Liability Cases,* 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327. In cases where the field is extremely narrow and well-defined, or where practical considerations admit of no sharing of power, the inference is very strong. *Oregon-Washington R. & N. Co. v. Washington, supra.* Where the history of the statute before congress indicates that it was intended to exclude the states from the field, the inference becomes conclusive. *New York Central R. Co. v. Winfield, supra.* We conclude that the strength of the inference to be drawn from the fact that the act fully covers a particular field will vary with the subject matter of the act and other circumstances legitimately bearing upon legislative intent. We do not deem the inference conclusive here, and when the subject matter and circumstances of its enactment are considered, we conclude that the inference is not permissible. It is evi-

dent that at the time of the enactment of the National Labor Relations Act congress was concerned first with the question whether it had any power at all in the field, and what the extent of that power was; and, second, what measures would be effective to bring order out of previous federal legislation and a great variety of federal agencies which were attempting administration of section 7 (a) of the NIRA (15 USCA, § 707 (a)). In relation to this subject, Senator Wagner said:

"Weak as it is, the present National Labor Relations Board has been subjected, in addition to the corroding influence of various industrial boards, dealing according to their own lights in the same subject matter, at present from thirteen to fifteen boards have been established to handle 7 (a) cases, and over none of these has the national board jurisdiction, either as to fact or as to law. Since there are now over one hundred codes which provide for the establishment of industrial boards, there exists the constant threat that dispersion of authority will transcend all reasonable bounds."

We discover nothing in the legislative history of the bill which later became the National Labor Relations Act to give comfort or support to the claim that congress intended to exclude the states from the whole field of labor relations so affecting interstate commerce as to warrant federal legislation. These relations had theretofore been considered as properly belonging to the states under the police power. Not only this, but as a result of decisions in *Hammer v. Dagenhart,* 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, and other cases involving the validity of federal child labor acts, as well as the cases of *A. L. A. Schechter Poultry Corp. v. United States,* 295 U. S. 495, 55 Sup. Ct. 837, 79 L. Ed. 1570, and *Carter v. Carter Coal Co.* 298 U. S. 238, 56 Sup. Ct. 855, 80 L. Ed. 1160, there was a very substantial doubt whether congress could enter the field at all. While there was no state law similar in purposes and provi-

sions to that of the National Labor Relations Act, the subject of labor relations had been dealt with by many state statutes in the exercise of the police power. No attempt will be made to furnish an exhaustive list of these state enactments. For purposes of illustration it is sufficient to mention that the state of Wisconsin had adopted the labor provisions of the Clayton Act; followed that up in 1931 with the Labor Code; and later enacted almost literally the provisions of the Norris-LaGuardia Act. No attempt was made in these statutes to differentiate between cases involving interstate commerce and those not involving it. In *Trustees of Wis. S. F. of Labor v. Simplex S. M. Co.* 215 Wis. 623, 256 N. W. 56, the Labor Code of 1931 was sustained and treated as in full force, and in *American Furn. Co. v. I. B. of T. C. & H. of A., etc.* 222 Wis. 338, 268 N. W. 250, and *Senn v. Tile Layers Protective Union,* 222 Wis. 383, 268 N. W. 270, 268 N. W. 872, the Clayton Act, Labor Code, and Norris-LaGuardia counterpart were all treated as valid regulations of labor relations. Upon appeal of the *Senn Case* to the United States supreme court, 301 U. S. 468, 57 Sup. Ct. 857, 81 L. Ed. 1229, full force and effect was given to the local law. This was also true in *Lauf v. E. G. Shinner & Co.* 303 U. S. 323, 58 Sup. Ct. 578, 82 L. Ed. 000. The point involved upon this appeal was not raised or considered in these cases either by this court or by the United States supreme court, and the foregoing facts are set forth simply to show that, in enacting the National Labor Relations Act, congress was entering a new and uncharted field, one in which the boundaries of any competency it might have were extremely doubtful. It was already occupied at least in part by state laws passed in exercise of the police power to preserve local peace and good order. What was doubtful at the time of enactment with reference to the boundaries of the power continues to be doubtful. In the

*Jones & Laughlin Case, supra,* the power of congress is asserted to enact all appropriate legislation for the protection and advancement of interstate commerce and the removal of burdens and obstructions to that commerce. It is possible, by adopting a course of reasoning which Mr. Chief Justice HUGHES in *Santa Cruz Fruit Packing Co. v. National Labor Relations Board,* 303 U. S. 453, 58 Sup. Ct. 656, 82 L. Ed. 000, refers to as the simple and familiar dialectic of suggesting doubtful and extreme cases, to propose a very startling and extensive broadening of the concept of interstate commerce, one indeed that virtually destroys the police power of the states. The court, however, has plainly indicated that the doctrine of this case does not go this far, and that the power of congress under the commerce clause must be consistent with maintenance of the federal system. Determination of the scope and extent of the power of congress is left to individual cases as they arise. It is said by the court in *Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra,* that (p. 466):

"It is also clear that where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to interstate commerce in order to justify the federal intervention for its protection. However difficult in application, this principle is essential to the maintenance of our constitutional system. The subject of federal power is still 'commerce,' and not all commerce but commerce with foreign nations and among the several states. . . .

"To express this essential distinction, 'direct' has been contrasted with 'indirect,' and what is 'remote' or 'distant' with what is 'close and substantial.' Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the constitution such as 'interstate commerce,' 'due process,' 'equal protection.' In

maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the gradual process of inclusion and exclusion."

It seems to us a violent assumption that in dealing with a subject in which the limitations on its power were and are so uncertain as to require determination by such a process congress could have intended to exclude state legislation in the field, except so far as it conflicted with the federal act. If it did so intend, then the prediction may safely be made that as a practical matter jurisdictional doubts will for years preclude effective administration either by the state or national governments. The fact that under the National Labor Relations Act the board initiates all proceedings to administer or to enforce the act should also be considered in this connection. It cannot have been supposed that the cases deemed by the board so importantly to affect interstate commerce as to warrant intervention or with which the board had time to deal would include all of the cases which the states might need to deal with in the interests of local peace and good order. It cannot have been intended to "paralyze the efforts of a state to protect her people against impending calamity" and commit the matter to the exclusive discretion of a distant and overworked federal agency. We conclude that the National Labor Relations Act has not superseded state legislation upon the subject, and particularly that it has not superseded the Wisconsin Labor Relations Act. We deem this conclusion to be in accord with the more recent cases having a bearing upon this question. *Kelly v. Washington*, 302 U. S. 1, 58 Sup. Ct. 87, 82 L. Ed. 000; *Chicago Title & Trust Co. v. Wilcox Bldg. Corp.* 302 U. S. 120, 58 Sup. Ct. 125, 82 L. Ed. 000; *South Carolina State Highway Dept. v. Barnwell Bros.* 303 U. S. 177, 58 Sup. Ct. 510, 82 L. Ed. 000; *Helvering v. Therrell,* 303 U. S. 218, 58 Sup. Ct. 539, 82 L. Ed. 000; *Western Live*

*Stock v. Bureau of Revenue,* 303 U. S. 250, 58 Sup. Ct. 546, 82 L. Ed. 000; and *Mintz v. Baldwin,* 289 U. S. 346, 53 Sup. Ct. 611, 77 L. Ed. 1245.

With the possibility of conflict in the administration of the state and national labor relations acts, we find no occasion to deal further than to state what is obvious: That in case there is conflict in a matter properly within the scope of the national act, the state must yield. See *Mintz v. Baldwin, supra.* We see no reason to anticipate and determine when and under what circumstances the state board is ousted of jurisdiction. That question is not here under the facts of this case, and the possibilities of conflict may never materialize. When they do, it will be time enough to attack the problems they present.

Defendant's next contention is that there was no substantial evidence to support the findings of the board, and that these are based upon mere conjecture. Defendant's use of the word "substantial" may indicate a misunderstanding as to the calls of the statute. Sec. 111.10 (5), Wis. Stats., provides in part:

"The findings of the board as to the facts, if supported by evidence in the record, shall be conclusive."

It may be profitable in ascertaining the meaning of this portion of sec. 111.10, Wis. Stats., briefly to review the provisions of the Workmen's Compensation Act and the holdings of this court with respect to it. Sec. 102.23 provides in part:

"(1) The findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive. . . . Upon such hearing, the court may confirm or set aside such order or award; and any judgment which may theretofore have been rendered thereon; but the same shall be set aside only upon the following grounds:

"(a) That the commission acted without or in excess of its powers.

"(b) That the order or award was procured by fraud.
"(c) That findings of fact by the commission do not support the order or award."

It will be noted that this section contains no express authorization for a review of the evidence. It is held that the scope of the review given by the statute is the same as that upon *certiorari,* and that if upon such a review the commission was found to have acted without evidence, it exceeded its powers, and the defect was jurisdictional. *General A. F. & L. Assur. Corp. v. Industrial Comm.* 223 Wis. 635, 271 N. W. 385, and cases there cited.

In *International H. Co. v. Industrial Comm.* 157 Wis. 167, 175, 147 N. W. 53, the rule in *certiorari* was stated to be that,—

"If in any reasonable view of the evidence it will support the conclusion arrived at, such conclusion will not be disturbed for want of support in the evidence."

In *Oldenberg v. Industrial Comm.* 159 Wis. 333, 335, 150 N. W. 444, it was stated:

"All evidence which tends to render probable or improbable the existence of the facts which are the subject of inquiry is relevant, and conversely all relevant facts have this tendency. In order to support an argument to the effect that an ultimate conclusion of fact has no evidence to support it there must be shown an absence of all evidence or an absence of any such relevant evidence."

The rule in the industrial-commission cases, therefore, is that if in any reasonable view of the evidence it will support the conclusion arrived at, the conclusion may not be disturbed upon the ground that it is unsupported by evidence. It has been the practice in later cases to state that awards of the industrial commission would not be disturbed if there was any evidence to sustain them. This means, and was intended to mean, the same thing as held by the earlier cases. Facts which have no tendency to prove or disprove an ulti-

mate fact have no relevancy. If they have such tendency, they constitute evidence, and if this evidence supports the finding of the industrial commission, the finding must stand. The Wisconsin Labor Relations Act in sec. 111.10 (5), Wis. Stats., provides what is lacking in the Workmen's Compensation Act, namely, an implied authorization to the courts to review the facts, coupled with the express provision that the findings, "if supported by evidence in the record," shall be conclusive. The extent of the review is the same as that under the Workmen's Compensation Act. The requirement is that there must be some evidence tending to support the finding of the board, and, if this is discovered, the court may not weigh the evidence to ascertain whether it preponderates in favor of the finding. From the fact that the contention concludes with the assertion that the findings are based on conjecture, we conclude that the use of the word "substantial" may have been an inadvertence, and we shall treat it as though it were to the effect that there was no evidence in the record to support the findings.

The findings themselves are somewhat inartificially drafted. That portion of the board's determination which is labeled "Findings of Fact" is largely a review of the evidence, including the contentions of the parties. While portions of it may satisfy requirements as to findings, much of it is devoted to evidentiary rather than ultimate facts. There are several equivocal statements, and there is at least one hypothetical conclusion. That portion of the determination labeled "Conclusions of Law" does, however, contain what may be considered proper findings to the effect, (1) that defendant has interfered with, restrained, and coerced its employees in the exercise of their organizational rights as defined in sec. 111.07, Wis. Stats., thereby engaging in an unfair labor practice within the meaning of sec. 111.08; and (2) that by discrimination against certain employees, de-

fendant has discouraged membership in an outside union and engaged in an unfair labor practice within the meaning of sec. 111.08 (1) and (3). The finding with reference to the discharge of Richard Assaf will be separately considered.

At the outset, it is necessary first to dispose of a contention that the findings were based upon a misconception by the board of the duties imposed upon the employer by the Wisconsin Labor Relations Act. Defendant asserts that the board throughout the hearing assumed it to be improper for an employer to have any contact with his employees or engage in any conversation with them respecting union matters, or indicate to the employees that as an employer he was not in favor of union organization. It is claimed that this is contrary to the act, and, if not, that the act is unconstitutional as violating defendant's right of free speech. The standard by which we are to be guided in dealing with this contention is that set forth by the United States supreme court in *Texas & New Orleans R. Co. v. Brotherhood of Railway & Steamship Clerks,* 281 U. S. 548, 568, 50 Sup. Ct. 427, 74 L. Ed. 1034. In this case the court had under consideration a provision of the Railway Labor Act to the effect that representatives of employees shall be designated without interference, influence, or coercion. The court said:

"The intent of congress is clear with respect to the sort of conduct that is prohibited. 'Interference' with freedom of action and 'coercion' refer to well-understood concepts of the law. The meaning of the word 'influence' in this clause may be gathered from the context. *Noscitur a sociis. Virginia v. Tennessee,* 148 U. S. 503, 519. The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. 'Influence' in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls 'self-organi-

zation.' The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this act than in relation to well-known applications of the law with respect to fraud, duress and undue influence."

There is little to add to the foregoing analysis. The right of free speech has never been considered to make impossible civil remedies or criminal prosecutions for libel, duress, or fraud, although speech was the agency in each case. The distinction between the exercise by an employer of his right of freedom of speech and the actual use of the spoken word as an instrumentality to overpower the will of employees is well understood, and constitutes the dividing line between what an employer may do and what he may not do. It may, of course, be difficult to determine in a particular case on which side of the line the activities of a particular employer fall, but this must be left to the trier of fact if there is room for conflicting inferences. We have reviewed carefully the evidence which was before the board and conclude that there is evidence to support the board's conclusion that the conduct of defendant was deliberately devised and calculated to override the will of its employees; that the company authorized its foreman to conduct activities in favor of the company union and against outside unions; and that the defendant, through its officers and agents, intentionally created the impression that membership in an outside union might result in discharge or in a shutdown of the plant. No useful purpose would be served by extending this opinion to include an analysis of the evidence in detail, and we merely indicate our conclusions as to what the evidence tends to prove.

With respect to the discharge of Assaf, the difficulty is not so much with the evidence as with the findings. In considering the circumstances of his discharge, the board was concerned with determining whether defendant had been

guilty of an unfair labor practice by reason of "discrimination in regard to hire or terms of tenure or other conditions of employment to discourage membership in any labor organization or to encourage membership in any company union." Sec. 111.08 (3). While there is a conclusion of law to the effect that the discharge of Assaf constituted a "discrimination in regard to" his tenure of employment, what purports to be the finding of fact in that respect is as follows:

"Richard Assaf, a member of the T. W. O. C., was discharged a few days after being warned by Mr. Rueping about union activities during working hours. The only stated ground of his discharge was 'dishonesty.' The management claimed he had entered a notation on a ticket that a lot of fourteen skins had gone through his drying kiln twice instead of once. The amount of pay involved was admittedly less than one cent. Assaf had been discharged in November, 1932, for false entries, and had been taken back in May, 1933. There was no claim of any further false entries between the latter date and the incident in question. On the other hand, on several occasions his records omitted items for which he was entitled to pay, and were corrected to his advantage. Rueping himself testified that Assaf was a 'most efficient workman, both careful and fast.' No opportunity was given Assaf to face and disprove the charge.

"Undoubtedly an employer has the right to discharge an employee for dishonesty. The evidence is conflicting as to whether the entry on which his discharge was ordered was in fact false, as alleged. If it was false, it is improbable that it was intentionally so, in view of the small amount (less than one cent) involved. We do not believe from all the circumstances that the alleged false entry was in fact the real reason for the discharge. On the contrary we believe from all the evidence that this was a pretext and that the controlling reason for his discharge was his union membership and activity."

The evidence is that Assaf had been rightfully discharged in November, 1932, for false entries upon his work cards which are the basis for wages for piecework. He was taken

back on probation in May, 1933. He was regarded as an unusually efficient workman. A few days before his discharge it is claimed that he had falsely entered a notation on a work ticket that a lot of fourteen skins had gone through his drying kiln twice instead of once. The amount by which his pay would be increased was somewhat less than one cent, but the offense, if committed, was of the same character as those for which he had previously been discharged. Shortly prior to this incident and to his discharge, Assaf had become active in promoting membership in the Committee for Industrial Organization. His activities had become known to the shop management, and he had been warned to cease his promotional activities during working hours. A report with reference to the false entry was made to the superintendent of the plant, and the discharge of Assaf followed.

Without reviewing the evidence in detail, we are of the view that the evidence would sustain a finding that there was no truth in the charge that Assaf had falsified his work card. He testified that he had put the skins through the drying kiln twice as he had reported, and we see no reason why the board might not have accepted his testimony in this respect. It was important, however, to determine unequivocally whether at the time of the discharge Assaf was guilty of dishonesty or infraction of working rules. If he was, then a valid and sufficient reason for his discharge wholly apart from his union activities existed for his dismissal. It is somewhat anomalous to speak of a valid reason for the dismissal of an employee who may be dismissed arbitrarily provided he is not discriminated against by reason of his union membership or activities. However, the existence of a reason which would characterize the discharge as a reasonable exercise of business prudence and judgment, and not a purely capricious act, is a circumstance of great importance where there is a charge of discrimination. While the em-

ployer may discharge without reason, the absence of a reason in connection with other circumstances may point strongly and perhaps inevitably to a forbidden discrimination. When a valid reason as heretofore defined is found to be present, it is relatively difficult and may be impossible to more than guess which reason motivated the discharge. The board could find discrimination here only by finding that the assigned reason for the discharge of Assaf was false because if it was not the evidence is in such state that a finding of discrimination would be pure conjecture. Furthermore, we have some misgivings whether, if a valid and sufficient reason for discharge exists, the real or motivating reason has any materiality whatever, unless it can be shown that in other cases where similar grounds for discharge of nonunion men existed, no such action was taken. The latter circumstance, of course, would point strongly to discrimination. This situation, however, was not present here, as there was no showing that the offense for which Assaf was discharged was one which other employees not connected with an outside union had committed with impunity. When conditions exist that make the discharge of an employee fair and reasonable exercise of the employer's right in that respect, and no other circumstances of discrimination are present, it seems at least questionable whether the existence or dominance of other motives for its exercise are entitled to consideration or weight. Since this point was not briefed or argued, we deem it unnecessary more than to suggest the question and the doubt.

We are unable to read out of the alleged finding of fact any finding at all with respect to the existence of sufficient cause for discharge. It is merely stated that the evidence as to whether the entry was false was conflicting, and that if it was false, it is improbable that it was intentionally so, in view of the small amount involved. There follows a state-

ment of the board's belief that the alleged false entry was not the real reason for the discharge, but a pretext, and that the controlling reason was his union membership. The statement that the evidence was conflicting is not a finding of any sort. Neither is the statement that it was probably unintentional. While the small amount involved might be material in considering the actual dishonesty of Assaf, it is quite evident that it does not determine the existence or absence of a valid cause for his discharge. Since he had theretofore been discharged for engaging in practices of similar character and rehired on probation, it was important to consider whether the employer might not have been justified in dismissing Assaf upon the first sign of a recurrence of the practice. Had there been a clear-cut finding that the dismissal was because of union activities on the part of Assaf, it might be argued that this included a finding that the reason for discharge assigned by defendant did not exist. However, the findings attempt specifically to deal with this question but by reason of their equivocal nature fail to resolve it, and we are not in a position to aid the situation by construction. It follows that the findings do not support the order with reference to Assaf, and that that portion of the order requiring his restoration must be set aside and the judgment modified to this extent.

*By the Court.*—Judgment modified as indicated in the opinion and, as so modified, is affirmed.

A motion for a rehearing was denied, without costs, on June 25, 1938.