Blum Brothers Box Company, Respondent, vs. Wisconsin Labor Relations Board, Appellant.

*October 12, 1938—January 10, 1939.*

616

For the appellant there were briefs by the *Attorney General* and *N. P. Feinsinger,* special counsel, and oral argument by *Mr. Feinsinger.*

For the respondent there were briefs by *Brazeau & Graves* of Wisconsin Rapids, and oral argument by *Theo. W. Brazeau.*

The following opinion was filed November 9, 1938:

MARTIN, J.  The respondent is engaged in manufacturing wooden boxes at Marshfield, Wisconsin, and employs approximately fifty men in its plant.  Its employees have no company or other union organization.  Mr. Hamm was not a member of any union.  It appears that Hamm was first employed by the respondent company on February 8, 1937. His work at that time was heading cheese boxes.  On May 15th he quit his job to go out west.  He returned to Marshfield and was re-employed by respondent on June 1, 1937. He was then put to work at odd jobs.  Later, he worked on the resaw and sometime thereafter he was put to work sorting cleats.  These several jobs were all within the mill. On April 12, 1937, his pay was increased from twenty to twenty-two and a half cents per hour.  After his second employment, and on July 6th, his pay was again increased to twenty-five cents per hour.  These were general increases

made to most of the company's employees. Mr. Hamm testified that he never asked for an increase in pay. The increases in pay were entirely voluntary on the part of the employer.

It appears that after Hamm's second employment on June 1st, he became interested in trying to organize a union of his fellow employees. Hamm's first efforts toward organizing a union were made between June 1st and 5th. He first talked to a Mr. Rasmussen who we assume was a union leader then employed at the Roddis plant in Marshfield. Hamm had heard that Rasmussen was going to have a meeting of the employees at the Roddis plant and wanted to see Rasmussen before attempting to organize a union of respondent's employees. Hamm asked Rasmussen when they could get an organizer to organize a union at respondent's plant. Rasmussen told Hamm to get the fellows, get the hall, and he would be there,—that is the organizer would be there. Hamm notified his fellow employees of the meeting to be held at which the union organizer was to be present. There seems to be a conflict in the evidence as to the date of this meeting. Hamm testified that the meeting was called about four days after he had started working on June 1st. He further testified that only five employees showed up at the meeting and because of the attendance no meeting was held. He further testified that he thereafter talked to his fellow employees and arranged for a second meeting to be held about a week later. This second meeting was to be held at the Eagles club. Only four employees showed up at the second meeting and no meeting was held. Mr. Hamm testified that right after the first meeting, Wilfred Reeths, one of the foremen at the Blum Brothers Box Company, said to him:

"You can join the union if you want to—we can shut down the plant for six months and don't need to turn a wheel."

Sometime thereafter, Hamm was transferred from his work in the mill to a job piling lumber in the mill yard. In piling the lumber, he worked alone. He testified he did not know the reason why he was transferred to piling lumber in the yard. He first denied that he had ever been reprimanded or scolded for not doing his work properly while working in the mill, but finally admitted that on one occasion Mr. Reeths did find fault with his work. He received the same pay for piling lumber that he received while working in the mill. Mr. Hamm was asked:

"*Q.* Do you know whether or not Mr. Blum knew whether you had planned a meeting? *A.* No.

"*Q.* Do you know whether Mr. Reeths or Mr. Blum knew you were talking union? *A.* No, sir. I don't.

"*Q.* Do you know whether or not Mr. Reeths knew you had planned a union meeting? *A.* Couldn't say right off. Seemed that way.

"*Q.* What do you mean—seemed that way? *A.* The way his actions were—shifting me around."

It appears that on Saturday afternoon, July 24th, Hamm, without permission, failed to return to his work. His work in the yard in piling lumber as it came from the mill required his presence at all times when the mill was in operation as it was on the Saturday afternoon in question. His absence caused the lumber to pile up, resulting in considerable inconvenience. When Hamm returned to work Monday morning, July 26th, he was without a job, his employer having put another man in charge of piling the lumber.

Hamm was asked:

"*Q.* When you came back the Monday after leaving that Saturday, without permission, did Mr. Reeths ask you where you went and what you did? *A.* Yes, sir.

"*Q.* And what did you say? *A.* I said I had to go places.

"*Q.* And did he ask you what you meant by that? *A.* I don't recall that.

"*Q.* And didn't you answer that that was answer enough to him? *A.* I figure this way—

"*Q.* But did you answer that way? *A.* I don't recall that.

"*Q.* Do you deny you.said that? *A.* No, I wouldn't but wouldn't say it either· way."

It appears that Hamm had failed to return to work on Saturday afternoon on one or two former occasions without having had permission from his employer. However, it does appear that the first Saturday afternoon he took off, he asked for and received permission. The company records show that he was off duty without permission only one Saturday aftenoon prior to July 24th. He seeks to excuse his not returning to work on Saturday afternoon, July 24th, because other company employees had done so and had told him it was not necessary to ask for permission. It appears that certain of the company's employees had a definite understanding with the company that they were not to work on Saturday afternoon. It also appears that other employees were engaged on piece work. In this connection, Hamm testified:

"*Q.* And you thought the employees were the ones to instruct you instead of your foreman or some member of the plant? *A.* Foreman never told me anything about it.

"*Q.* Do you think some employee was the person to go to ask about that? *A.* No, sir.

"*Q.* You knew if you were to find out the fact and you wanted to find it out, that an employee was not the person to go to? *A.* Yes, sir.

"*Q.* And you never went to anybody in the firm to ask that? *A.* No, sir, because the other fellows—

"*Q.* Wait a minute, and I understand your reason is because you asked some employee? *A.* No, sir.

"*Q.* What was the reason? *A.* Asked once and the second time without and I asked some of the people and they said 'What do you want to ask for; we don't; we just stay home.'

"*Q*. You knew what those employees told you, you just said, wasn't the place to get your instruction? *A*. I felt if they could do it that I could too."

Finally, appellant's position may be stated thus: First, that Hamm had a right to take off on Saturday afternoons without permission because some other employees had done so; second, that Hamm was discriminated against and discharged because of his union activity. There is some evidence that he talked unionism during working hours and after working hours. There is no evidence that any of the company officials or foremen heard him discuss unionism. His efforts in trying to organize the respondent's employees were practically nil. Out of a total of approximately fifty employees, five attended the first meeting arranged by Hamm for the purpose of organizing a union, and four employees attended the second meeting he arranged. He testified that neither meeting was in fact held because of the few who responded to his call.

The appellant board, in one of its findings of fact, says:

"In support of its claim of violation of rules, respondent relied on the fact that Hamm had taken off the Saturday afternoon prior to his discharge, without permission. However, the evidence shows that there was no established company rule prohibiting employees from taking time off without permission; that employees quite frequently took time off, especially Saturdays, without permission and with no consequent punishment; that Hamm himself had been off several previous Saturday afternoons without permission, and had never been reprimanded or cautioned; that at least one other employee took time off without permission after Hamm was discharged."

It would hardly seem necessary for an industrial plant to establish rules forbidding employees to walk off their jobs without notice or permission. If the absence of such a rule is a justification for one employee to do so, it would be a justification for all. If the fifty employees of the respondent

company, or a large number of them, because of the absence of such rule, should conclude to walk off their jobs at the same time, the plant would have to suspend operations. In considering Hamm's conduct, it is highly important to keep in mind the fact that he was the only employee in the yard to take the lumber as it came from the mill and pile it. While it would not make any difference as a matter of law if there were other employees in the yard charged with the duty, in case of necessity, to do Hamm's work, the undisputed fact is that Hamm was the only employee in the yard whose duty it was to do this particular work. When respondent's mill started operating after the noon hour on Saturday, July 24th, it was assumed that Hamm was at his post of duty. Finally, it was discovered that the lumber was piling up as it went out from the mill to an extent which necessitated a shutdown for a time until another employee was sent out to the yard to do the work Mr. Hamm was supposed to be there to do.

The finding that "Hamm himself had been off several previous Saturday afternoons without permission, and had never been reprimanded or cautioned . . ." is contrary to his own testimony and the company records.

As to the employee, Fay Getlinger, who took time off without permission after Hamm was discharged,—the testimony does not disclose the nature of his work. However, he testified that he took Saturday afternoons off once or twice after Hamm was discharged. He testified he knew Hamm was discharged for taking Saturday afternoon off without permission. He further testified:

"I tried to take Saturday afternoons same as others to see if I would get fired or not. I wanted to see if I was going to get fired or not."

He further stated that he quit because the company was not paying enough wages and because he did not like the foreman, Mr. Reeths.

Ray Rockenbauer and Clement Fleishner, employees of the respondent company, both testified that on July 11th, they heard Foreman Reeths make the statement, "We have got the man out there now where he can't talk." Both admit Hamm's name was not mentioned; that they never heard Mr. Reeths or Mr. Blum make any statement about the union.

There is not a scintilla of evidence that there was any hostility on the part of any of the officers or foremen of the respondent company toward Mr. Hamm, or that Hamm was discriminated against in any way because of his fruitless attempts to organize a union of respondent's employees. Appellant contends that the fact that certain of the employees took off on Saturday afternoon without permission, and that Hamm was discharged because he took off on the Saturday afternoon in question without permission, shows a discrimination against Hamm. Hamm knew that he was the only employee in the yard charged with the duty of taking the lumber as it came out from the mill and piling it. He knew the consequences of his not being there to do that work. He also knew that permission to take off on that Saturday afternoon should have come from some official of the company. Because some other employees may have violated their duty in taking off without permission does not justify his doing so. Two wrongs never make a right.

It is claimed that Hamm was discriminated against because he was transferred from work in the mill to work out in the yard. The testimony is uncontradicted that while he was working in the mill, he worked on at least three different jobs. He did odd jobs in the mill, worked on the resaw and sorted cleats. His work on the latter job was not entirely satisfactory according to his own testimony. Mr. Paul Blum testified concerning Mr. Hamm's second employment by his company, that is, the employment commencing June 1, 1937:

"According to the records, he [Hamm] came back on June 1st, reported there a number of times looking for work

and was asked whether he would work steady if we put him back on. His services the first time apparently were satisfactory because none of the foremen complained about the service, but the second time the work was not satisfactory and *we kept shifting him around, from one place to another, hoping to find a place he would fit in."*

The testimony shows that Hamm was very talkative while on the different jobs in the mill. He testified that his talk about unionism was principally during the noon hour or after hours of work. He admits he never complained to his foreman or to any official of the company that he was dissatisfied with his work, working conditions, or wages paid.

We have in the instant case, according to the uncontradicted testimony, as a matter of law, sufficient grounds for Hamm's discharge. All of the respondent's testimony is to the effect that Hamm was discharged for his failure to be on duty on Saturday afternoon, July 24, 1937; that he was not discharged or discriminated against in any way because of his attempt to organize a labor organization among respondent's employees. This is a case where the employer had an absolute right to discharge its employee, Hamm, but the claim is made that he was not discharged for the legal cause,—that he was discharged by reason of his attempt to organize a labor organization among respondent's employees. The complainant has the burden of proof to overcome the fact that legal cause for the discharge existed. To uphold the findings and order of the Labor Relations Board, there must be sufficient evidence that the real, actual cause for Hamm's discharge was his union activity.

In *Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 498, 279 N. W. 673, the court said:

"However, the existence of a reason which would characterize the discharge as a reasonable exercise of business prudence and judgment, and not a purely capricious act, is a circumstance of great importance where there is a charge of discrimination."

Further, the court said:

"While the employer may discharge without reason, the absence of a reason in connection with other circumstances may point strongly and perhaps inevitably to a forbidden discrimination. *When a valid reason as heretofore defined is found to be present, it is relatively difficult and may be impossible to more than guess which reason motivated the discharge.*"

In *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 331, 248 N. W. 140, the court said:

"It will not do to reach a conclusion in favor of the party on whom the burden of proof rests by merely theorizing and conjecturing. There must at least be sufficient evidence to remove the question from the realm of conjecture. . . . While it is within the province of the commission to draw inferences, they must be drawn from established facts which logically support them. If not so supported, the findings of the commission based on its inferences are mere conjecture in excess of its powers, and the action of the commission must be reversed."

And in *Hills Dry Goods Co. v. Industrial Comm.* 217 Wis. 76, 84, 258 N. W. 336, the court said:

"The inference must not only be rational, but it must be a logical deduction from the established facts and not one of *several inferences* which might with equal propriety be drawn from the same facts."

The United States supreme court, in *National Labor Relations Board v. Jones & Laughlin Steel Corp.* 301 U. S. 1, 45, 51 Sup. Ct. 615, 81 L. Ed. 893, referring to the National Labor Relations Act, said:

"The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the board is not entitled to make its authority a pretext for

interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion. The true purpose is the subject of investigation with full opportunity to show the facts. It would seem that when employers freely recognize the right of their employees to their own organizations and their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge."

In appellant's reply brief counsel says:

"At no time have we denied that absence from work without previous permission is a 'valid and sufficient reason for discharge' as defined in the case of *Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 279 N. W. 673."

However, notwithstanding the valid and sufficient reason for discharge, counsel argues that there was discrimination against Hamm on account of his union activity. Merely showing union activity on the part of Hamm and his discharge is insufficient to sustain findings of discrimination. *National Labor Relations Board v. Pacific Greyhound Lines* (9th Cir.), 91 Fed. (2d) 458, 459.

We have carefully examined all the evidence and conclude that there is not sufficient evidence to remove the findings made from the field of conjecture. The trial court properly vacated and set aside the findings and order, and the judgment accordingly entered must be affirmed.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on January 10, 1939.