**NEW IDEA, Inc., v. NATIONAL LABOR RELATIONS BOARD.**

**No. 7361.**

Circuit Court of Appeals, Seventh Circuit.

Feb. 6, 1941.

Lee C. Shaw and Henry E. Seyfarth, both of Chicago, Ill., for petitioner.

John F. Cusack, of Chicago, Ill., for petitioner Independent Ass'n.

Robert B. Watts, NLRB, of Washington, D. C., and I. 'S. Dorfman, of Chicago, Ill., for respondent.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This case is before us upon the petition of New Idea, Inc., to review and set aside, and upon the petition of Independent Employees Association of New Idea, Inc., to review and modify, an order of the National Labor Relations Board issued pursuant to Section 10(c) of the National Labor Relations Act. 49 Stat. 449, 29 U.S. C.A. Sec. 151 et seq. In its answer the Board has requested enforcement of its order.

Upon charges duly filed by the International Association of Machinists and the International Brotherhood of Blacksmiths, Drop Forgers and Helpers, both organizations affiliated with the American Federation of Labor and hereinafter jointly referred to as the A.F.L., the Board issued its complaint against the Company alleging that it had engaged in unfair labor practices within the meaning of Sections 8(1) and 8(2) of the Act. In substance the complaint alleged (a) that in August of 1937 the Company instigated the formation of the Independent Employees Association and thereafter dominated, interfered with and contributed support to its administration; (b) that in September of 1938 the Company entered into an illegal bargaining contract with the Association; and (c) that from August of 1937 to the date of the complaint the Company interrogated its employees regarding their union activities and warned them to refrain from joining or retaining membership in the A.F.L. The Company filed an answer denying that it violated the Act in any manner.

The complaint above described was issued on May 26, 1939, the Company's answer was filed on or about June 3, 1939 and the hearing was held from July 6 to 14, 1939. On September 29, 1939 the Trial Examiner filed an Intermediate Report in which he found that the Company had engaged in unfair labor practices in violation of Sections 8(1) and 8(2) of the Act. He recommended that the Company cease and desist from certain acts and take certain affirmative action. On March 7, 1940 the Board rendered its Decision and Order, in which it found that the Company had violated 8(2) of the Act by sponsoring, dominating and interfering with the formation and administration of the Association and by contributing support to it. The Board also found that the Company had violated 8(1) of the Act by committing the aforesaid acts, by entering into the September 28, 1938 contract with the Association and by making other statements and engaging in other activities. Upon these findings of fact the

Board based its order which contained the usual cease-and-desist provisions and compelled certain affirmative action.[1]

**■** *Applicability of the Act.* New Idea, Inc., is an Ohio corporation with its principal office located in Coldwater, Ohio. It owns and operates two plants at Coldwater, Ohio, and Sandwich, Illinois, and is engaged in the manufacture and sale of farm implements including hay loaders, hay rakes, portable grain elevators and corn shellers. This proceeding concerns the plant located at Sandwich, Illinois, a town of about 2600 inhabitants, and on September 1, 1937 this plant was employing approximately 179 employees.[2] It was situated on 12 acres of land and comprised numerous buildings wherein foundry, machining, wood making, painting and assembling operations occurred. In 1938 its gross sales exceeded $675,000, approximately 75 per cent of which represented sales to purchasers located outside the State of Illinois. In the same year it purchased raw materials the cost of which exceeded $475,000, approximately 50 per cent of which represented purchases made in states other than the State of Illinois. It is clear that the Act applies to the Company and its employees.

*Formation of the Association.* No labor organization existed at the Company's Sandwich plant prior to August 23, 1937 made before August 19, 1937. On August 19, 1937 Richard L. Sidford, foreman in charge of the stockroom, and Douglas Watt, an employee, initiated the formation and no organizational efforts had been of the Association. Pursuant to Sidford's suggestion they visited the office of John F. Cusack, a Chicago attorney at law, who supplied them with a constitution, by-laws and application forms for a union. Since the by-laws barred supervisory employees from participation in the Association, Sidford withdrew and Watt proceeded to organize the Association.

Watt planned an employee meeting to be held at the City Hall on the evening of August 23, and on August 19 arranged to have Wallace E. Cochran, mayor of the city, preside as chairman at the meeting. On August 23 Watt had a second conference with Cusack in Chicago. This time he was accompanied by Fish, an employee, and Eldred, at that time assistant foreman and now foreman of the paint department. According to Fish and Eldred, they did not participate in this conference with Cusack nor did they know or ask what kind of union Watt was promoting. Upon their return to Sandwich about noon Fish and Eldred returned to work, but Watt spent the afternoon circulating through the plant to inform the employees of the meeting, and preparing

---

[1] Paragraph 1 of the Board's order required the Company to cease and desist from the following: (a) Dominating or interfering with the administration of the Association, or the formation and administration of any other labor organization of its employees, and contributing any support to the Association or to any other labor organization of its employees; (b) recognizing the Association as the bargaining representative of any of the employees; (c) giving effect to any bargaining agreement with the Association; and (d) in any other manner interfering with the employees' right to form, join or assist any labor organization.

Paragraph 2 of the order compelled the Company to take the following affirmative action: (a) Withdraw all recognition from the Association as the bargaining representative of any of its employees, and completely disestablish the Association as such representative; (b) post notice of compliance by the Company as to paragraphs 1 and 2 of the order above described; and (c) notify the Regional Director of the compliance.

[2] The work of the plant is handled through 11 departments, namely, foundry, storage, machine, paint, assembling, receiving, shipping, warehouse, tool, repair and yard. There are 11 foremen, one for each department, among whom were Sherman, Hansen, Arthur Rosinstrator, C. Hartman, H. Hartman, E. Todd, F. Whitsen, H. Nelson, Richard L. Sidford, C. Leng, F. Weber and D. Seever. There are 14 clerical employees and 152 production employees. In the last group are included assistant foremen among whom in 1937 were Wells Wilson, Ingvald Thorsen, George Priesman, C. Hatter, Earl Walker and Herbert. Aloys Mueller is General Manager, Harry Miller is Superintendent, Laverne Wallis is General Inspector and Edward Eagle is General Foreman. The record also discloses that Eagle was foreman of a department in 1937; that Carl Jensen was made an assistant foreman in 1939; that M. Sandoval was made an assistant foreman in July of 1938; that L. Hubbard was made foreman of a department in 1939; and that Herbert Eldred was made foreman in the paint department in 1939.

for the meeting to be held that night. He also discussed the meeting with Harry Miller, plant Superintendent, and pursuant thereto Miller ordered the departments then working overtime to close early so that the employees could attend the meetings. This was the only instance of such a shut-down of the plant during the overtime period which began about 6 weeks prior to August 23 and continued for about 4 weeks thereafter.

During the course of the afternoon of August 23, the employees received notice of the employee meeting to be held that evening. Some of the foremen and assistant foremen not only informed the employees of the overtime cancellation but also urged their attendance at the meeting and told them the purpose of the meeting was to organize an independent union within the Company's plant for the purpose of keeping out any "outside" labor organization. For instance there is testimony that Weber, foreman of the yard, announced to a group of 15 or 20 employees working in the yard that "I don't believe I have seen you fellows yet. * * * We are going to have a meeting at the City Hall tonight to form an Independent Union of our own. I want all my men to be there because we want this union to keep out other organizations. * * *" Edward Eagle, then a foreman, was attributed with the statements that "they were going to organize a union, an independent union in the company, because there had been so much C.I.O. and A.F. of L. trouble around they didn't want that in this factory" and that "the purpose is to keep out the C.I.O. and the A.F. of L." Ingvald Thorsen, assistant foreman of the yard, was attributed with the statement that "we are going to organize a union of our own here to keep out the A.F. of L. and the C.I.O., because we don't want any trouble here."

■ The above named supervisory employees denied making these statements. For instance foreman Eagle testified that some employees requested leave from overtime work to attend the night meeting, that he sought and obtained permission from Superintendent Miller to shut down his department, that he so informed the employees, but that he neither urged attendance at the meeting nor knew of the purpose of the meeting. In this connection Watt testified that he had advised Superintendent Miller of the purpose of

the meeting. In any event the Board resolved the conflict in the testimony against the supervisory employees, and we need only add that it is the province of the Board and not of this Court, to appraise conflicting testimony and determine questions of credibility. In this regard the argument is presented that since at that time neither the A.F. of L. nor the C.I.O. had attempted to organize the plant, it is incredible that the statements attributed to the foremen and assistant foremen were made. We note that in the spring and summer of 1937 head-lines and features in the daily newspapers told the story of labor disturbances throughout the nation, of the sit-down tactics of the C.I.O., of the rivalry between the C.I.O. and A.F.L., and of the contagious unionization campaigns by these national organizations in connection with the National Labor Relations Act. It also appears that at that time the A.F.L. was attempting to organize the Company's plant at Coldwater, Ohio. See Matter of New Idea, Incorporated and American Federation of Labor, 5 N.L.R.B. 381.

About 15 minutes before the employee meeting was scheduled to begin, Superintendent Miller stationed himself at the entrance to the City Hall and later took a position above the second landing on the stairway leading to the meeting room. Miller testified that his purpose in being there was to prevent foremen and assistant foremen from attending the meeting, and that Mayor Cochran had requested him to give such instructions to these supervisory employees. Miller prevented Earl Walker, assistant foreman in the shipping department, from attending the meeting but Thorsen and Eldred, assistant foremen in the yard and paint departments respectively, attended. Miller testified that he stayed at the meeting hall about 40 minutes but there is testimony that he stayed until just before the meeting was over. Walker testified and Miller denied that he (Miller), after asking Walker not to attend the meeting, declared that he "would like to see the boys organize into a home union and keep the outside unions all out." Walker subsequently joined the Association and in January of 1938 became its vice president. When elected to office Walker saw Miller and asked him if he was eligible to hold office. There is testimony that Miller told him that his eligibility to office was a matter for him

to determine and that his holding office would not "do any harm to the organization or to the company."

Between 125 and 150 employees attended the meeting over which Mayor Cochran presided. Mayor Cochran made the only speech of the evening in which he urged the formation of the Association and voiced opposition to the national labor organizations. For example some of the uncontradicted testimony in this respect was that "any outside labor organizations such as the A. F. of L. or the C. I. O." were not wanted in Sandwich and that the employees should not "wait until some organizer comes out and tries not only to organize, but also disorganize the smooth-running program you now have." At the close of the speech, practically all of the employees present signed application cards for membership in the Association. There was no discussion from the floor and no vote was taken to ascertain the desires of the employees. Assistant foremen Eldred and Thorsen, who throughout the meeting had occupied positions at a table in the front of the meeting room facing the other employees, assisted in the procuring of the employee signatures to the application cards.

On August 24 the application for articles of incorporation of the Association was signed by Watt, assistant foreman Eldred and five other employees. The necessary signatures were affixed to the aplication during the noon hour and in the office of the plant Superintendent, but there is no evidence that Miller knew his office was so used. Pursuant to an arrangement made at the first organizational meeting on August 23, the Association met on September 9, 1937, with Mayor Cochran again presiding. The constitution and by-laws as revised were approved, and a nominating committee consisting of assistant foreman Thorsen and three other employees was selected by chairman Cochran. This committee submitted its list of candidates to the membership, and from this list the Association's first officers were elected for the duration of 1937. Watt was elected president, assistant foreman Eldred was elected secretary and another employee Kotopp was elected treasurer.

*Subsequent History of the Association.* The Association was incorporated under the laws of the State of Illinois on August 27, 1937. Regular meetings were held the first Friday in each month, various committees were selected for the consideration of business and departmental representatives were elected to represent the employees, to carry on the grievance procedure and to collect dues. The first election of regular officers for the Association occurred the first week in January of 1938 and the following employees were elected for one year terms: Harry Erwin, president; assistant foreman Earl Walker, vice president; assistant foreman Herbert Eldred, secretary; and Henry Kotopp, treasurer. These officers were re-elected for a second term in January of 1939, with the exception that John Francis was elected secretary in place of Herbert Eldred, who ceased all activities in the Association soon thereafter when he became foreman of the paint department.

The testimony also discloses that after the formation of the Association, much of its organizing campaign and routine business was transacted on the Company's premises during and after working hours. Thus, in the plant, membership cards were distributed to many of the employees who had signed application cards at the August 23 meeting, other employees were solicited to join the Association, and Association dues were collected and turned over to the Association treasurer. Furthermore it appears that this activity frequently was carried on in the presence of supervisory employees and that assistant foreman Eldred as secretary of the Association and assistant foreman Thorsen as departmental representative participated in the Association activity described above. On two occasions departmental representatives for the Association were chosen at elections held in the plant. These elections were held in the presence of foremen, once during the noon hour and the other time during working hours but in the course of a lull in operations.

On September 21, 1937 Watt presented a written demand to the general manager of the Company for sole collective bargaining recognition and on September 28 the Company granted the Association the requested recognition. In January of 1938 Erwin was elected president of the Association to succeed Watt, and upon his election he made a speech to the membership. In this speech, according to Erwin's testimony, he announced that "the general consensus of opinion of the membership was that this was a second rate outfit," that he was of the opinion "that no organization could

function properly where about ninety per cent of the men were in the dark concerning the set-up of the organization," that he did not intend to be president of a "second rate outfit," and that he "would get up and fight for the boys and do everything that could be accomplished in the way of a good organization."

On February 23, 1937 the Association considered and adopted certain proposed by-laws, about half of which dealt with terms and conditions of employment, while the others related to items concerning internal organization. On February 24 Superintendent Miller called Erwin to his office, and interrogated him with respect to the meeting the previous night because he "wanted to know what happened at the meeting, how they were progressing, how things were going on." There is Erwin's testimony, denied by Miller, that Miller told Erwin during the course of this conversation that he "was against any organization being in the Sandwich plant" and that "we did not especially need any outside labor organizations, but in view of the fact that Mr. Synck [president of the Company] wanted the Independent Association that he was forced to cooperate with" it. Erwin further testified that Miller asserted that the Association was "being run by a minority group of radicals," a statement the authorship of which Miller denied.

On March 21, 1938 the Association transmitted its new by-laws, some of which were proper items for collective bargaining, to President Synck (whose office was located in the Coldwater, Ohio plant) "for approval." With the by-laws Erwin also sent a letter which informed Synck that "there has been, on the part of a few of the local company officials, an utter lack of co-operation with and respect for" the Association, and that this "serious situation has naturally caused much dissatisfaction, and I believe, has created a wonderful opportunity for other labor organizations to step into the local picture." On March 29, 1938 Synck replied to the Association's letter. In his letter he observed generally that the laboring man has been given advice by idealists and theorists who advocate shorter hours and higher wages without considering their relation to the problem of production, and he referred to these advocates as preachers of "false doctrines"; he then pointed out that some of the by-laws submitted by the Association were articles for bargaining and suggested that the Association might "prefer some sort of contract or written agreement, embodying these bargaining and other points"; and he concluded the letter by suggesting a group health and accident insurance plan for the members of the Association.

On April 26 Synck wrote to the Association, urged a reply to his letter of March 29, and requested "further particulars" concerning the "bargaining points" which the Association had included among its by-laws in order that "if there is anything there that should be adjusted it can be done without too much delay." Synck again concluded his letter with the suggestion of group health and accident insurance and therein pointed out that it would give the membership "some advantages that they would not have unless they belonged to that Union." Some time passed with no response from the Association to Synck's letter of April 26. On August 26, 1938, still having had no reply, the Company submitted a proposed contract to the Association through Mueller, Sandwich plant manager.

On August 30 Erwin telegraphed Synck, complaining again of the "indifferent attitude" and lack of "proper recognition and co-operation" on the part of the local plant officials in their relation to the Association. He further warned that some members of the Association were contemplating withdrawal from the organization and "membership in other national labor organizations." On August 31 Synck replied among other things that "I can not exactly understand the attitude of some of the members as explained in your telegram," that "Your telegram does not say anything regarding the reception of the contract that we sent up," that "I am instructing Al Mueller, our Sandwich Manager, to keep in touch with you regarding the new contract," and that "Our Board of Directors feel very friendly to our Sandwich operations and I should not like to see this friendly feeling disturbed or marred by any adverse actions."

The proposed contract was taken under advisement and considered thoroughly by the Association. In general the members expressed satisfaction with the contract, and they appointed a committee to confer with the Company as to several points which they wanted changed or clarified. On September 16, 1938 a short conference

was held between this committee and representatives of the Company and the differences were settled. Shortly thereafter the redrafted contract was approved by the Association and on September 28, 1938 the contract was executed by both parties. This contract contained provisions for recognition, wages, hours of work, conditions of employment, vacations, dismissals, cessation of work, settlement of disputes, duration of the agreement and future conferences beween the Association and the Company.

Notwithstanding the execution of the contract a dissatisfaction with the Association continued among its members. Finally, at a regular meeting on February 3, 1939, the membership instructed Erwin to obtain information about the A. F. L. The minutes of the Association for that date show that the members indicated their unwillingness to continue the Association as it was then operating and that "Information about the workings of the A. F. of L. was asked for." At special Association meetings on February 10 and 20, a representative of the A. F. L. addressed the members of the Association. At the meeting on February 20, Erwin (president of the Association) applied for membership in the A. F. L. and signed the application card in the presence of about 100 Association members attending the meeting. Earl Walker (vice president of the Association) and John Francis (secretary) also applied for membership in the A. F. L., and the three Association officials above named continued their dual membership up to the date of the hearing.

In this connection there is also testimony that some time in April of 1939 assistant foreman Sandoval approached John Francis in the plant and stated that he understood "the men are having a little trouble with the union." When Francis told him that some of the Association members were "contemplating calling in an outside organization because they are dissatisfied with the present set-up," Sandoval replied that "Well, the A. F. of L. may be all right * * * but I think that the company has treated the men pretty good here and, in order to avoid trouble, they ought to stick."

Counsel for the Association attacks Erwin, Francis and Walker as "traitors" who "betrayed the trust reposed in them by members of the Association" and who entered into a conspiracy with the A. F. L. "to steal a going Union." It is obvious that counsel's outburst of invective has for its purpose the discrediting of witnesses Erwin, Francis and Walker upon whose testimony the Board's order is largely based. In this regard we note that the three officials of the Association joined the A. F. L. after the February 3 meeting, the minutes of which indicated the members' dissatisfaction with the Association; that Erwin signed his A. F. L. application card in the presence of the members attending the February 20 meeting of the Association; that they remained officials of the Association apparently without protest by the membership; and that there was no testimony that any member of the Association considered them "traitors." We do not think that under the circumstances, their "dual unionism" necessarily affects their credibility adversely. Certainly we can not conclude on this record, as counsel for the Association would urge, that the Board erred in believing Erwin, Francis and Walker rather than witnesses for the Company and the Association.

*Substantiality of the Evidence.* The main question here is whether the Board was justified in its conclusion that the Association was not the product of the employees' free choice because the Company had interfered to impair their freedom. We have already discussed the point of credibility of witnesses to some extent, and we conclude that on the record before us the Board had the right to believe the story told by the Board's witnesses. If that story is believed, we note the following: (1) The drive to organize the Association as set in motion by a foreman and an employee; (2) the urging of employees by foremen to attend the first organizational meeting and to form an organization in order to "keep out" the A. F. L. and C. I. O.; (3) the Company's cancellation of overtime and shut-down of the plant to enable the employees to attend the meeting; (4) the Company's hostility toward outside unions as evidenced by statement made by Superintendent Miller; (5) Miller's presence at the meeting hall; (6) Miller's questioning of the officials concerning affairs of the Association; (7) approval of or acquiescence by the Company in the use of Company time and property for Association affairs; (8) the employees' growing dissatisfaction with the Association; (9) Synck's concern over

situation described in (8), as evidenced by his letters to the Association; (10) Synck's insistence on the proposed contract and his suggestion of insurance plan, as shown by his letters; and (11) the activity of the assistant foremen in the formation and subsequent history of the Association.

Counsel for the Company and for the Association emphasize the following facts: (a) The Association hired its own attorney, collected dues, held regular meetings off Company property, elected officers, and received no financial assistance from the Company; (b) the Association negotiated a collective bargaining contract with the Company; and (c) the Association disposed of certain grievances and obtained various plant improvements. Counsel also maintain that the Board has utilized trivial incidents as a basis for its findings, that there is no evidence that the genesis of the Association was suggested by the Company, that there is no evidence that the Company ever threatened to discharge employees if they joined outside labor organizations, and that the evidence at the most merely presented a case of weak interference under Section 8(1) of the Act.

█ Taken by themselves facts (a), (b) and (c) above constitute evidence which tends to demonstrate the independence of the Association after its formation and organization. Yet these facts constitute only "part of the imponderables which the Board was entitled to appraise." National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 366, 85 L.Ed. —, announced by the Supreme Court on January 6, 1941. Also, as the Supreme Court stated in the Link-Belt case supra, "Intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge." It is clear that from the total picture of evidence, the Board could have inferred that the employees had not formed the Association with complete freedom from Company domination, interference or support. Even if item (11) of the evidence outlined above were absent in this case, "it would be unfair to conclude that the employees did not feel an actual pressure from the management." Here "no one fact is conclusive. But the whole congeries of facts before the Board supports its findings." See Link-Belt case, supra.

█ *Activities of Supervisory Employees.* Counsel for the Company and the Association contend that the Company is not answerable for the acts of its supervisory employees in the absence of some actual authority, and point to the fact that foremen did not have the power to hire and discharge employees and that in addition the assistant foremen were eligible to membership in both the Association and the A. F. L. Recent Supreme Court cases have given recognition to the management status of minor supervisory employees and it is plain now that foremen and assistant foremen may be management representatives and their acts attributable to the employer. For instance the absence of actual employer authority is not of controlling importance. Heinz Co. v. National Labor Relations Board, 61 S.Ct. 320, 85 L.Ed. —, announced by the Supreme Court on January 6, 1941. Nor are ineligibility to union membership and the power to hire and fire, conditions precedent to employer responsibility for the acts of supervisory employees. International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 89, 85 L.Ed. —. As expressed by the Supreme Court, "all had men working under them. To be sure, they were not high in the factory hierarchy [minor supervisors with less than foreman rank] and apparently did not have the power to hire or to fire. But they did exercise general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management * * * the fact that they were bona fide members of petitioner [A. F. L. union] did not require the Board to disregard the other circumstances we have noted."

In our case the supervisory employees directed the employees at work. While the power to hire and discharge was exercised by the General Manager only, he considered the recommendations of foremen and assistant foremen as of "persuasive effect" or of "some bearing" in the matter of discharge. Foremen were in complete charge of their departments, planning and directing the work therein. The assistant foreman transmitted orders to the employees directly, helped and instructed them, reported back to the foremen, and substituted for foremen in their absence.

█ Under these facts it is plain that these supervisory employees were management representatives. Certainly the Com-

pany recognized this when it ordered them to keep away from the first organizational meeting of the Association and when it designated them "foremen" and "assistant foremen." Also there is evidence that the employees regarded them in the same light. Obviously it was for this reason that employees ranked them as "foremen" and "assistant foremen" and followed their instruction and advice as to the work, that they raised "some question" as to whether Earl Walker (assistant foreman) should hold office in the Association and that employee Watt advised Sidford (foreman) not to participate further in the formation of the Association. It is our conclusion, based on our analysis of the Supreme Court cases cited above, that there is adequate basis for the Board's finding that the Company was responsible for the activities of the supervisory employees.

*Order Disestablishing Association.* Counsel for the Company contends that the evidence in this case does not indicate "that degree of mastery or control of the Association which would justify its disestablishment." We admit this contention appeals to us but the Heinz, International Association of Machinists, and Link-Belt cases compel our disposition of such a contention adversely to counsel. The language in the Link-Belt case is strong: "It is urged * * * that an order directing the employer to cease and desist all interference with the employees and with Independent is wholly adequate for the evil at hand. * * * We cannot assume that the employees will be free from improper restraints and will have the complete freedom of choice which the Act contemplates where the effect of the unfair labor practice [Employer domination, interference or support of the Independent union] is not completely dissipated. The Board not the courts determines under this statutory scheme how the effect of unfair labor practices may be expunged." There is similar language in the Heinz and Machinists cases. Counsel has sought to distinguish the Heinz and Machinists cases from the case at bar but our thought in the matter is that we can not ignore the plain language used therein. The question is not whether we would have ordered disestablishment in the first instance, but whether the Board abused its discretion in so doing.

Clearly the Board has power under the Act to remove employer domination, interference or support of the Association, and to remove this influence by disestablishing the Association is not necessarily an abuse of the Board's discretion. It is our conclusion that there are circumstances disclosed by the evidence which afford adequate basis for the order of disestablishment. Counsel for the Association states that "the most the Board should be permitted to do [in this case] is to hold an election in which the Independent would be given a place on the ballot." We can only say that counsel must take comfort in the thought that "Nothing in the order precludes members of the Association from establishing an organization independently of participation by * * * [the Company], and from securing recognition through certification of the Board or an election as provided by § 9(c) of the Act." [61 S.Ct. 324, 85 L.Ed. ——.]

*Leave to Adduce Additional Evidence.* The hearing before the Board closed on July 11, 1939, a hearing before the Board for the purpose of oral argument was held on December 12, 1939 and the Decision and Order of the Board was entered on March 7, 1940. On April 15, 1940 the Association filed a petition with the Board for leave to introduce further evidence. On April 20, 1940 the Board denied the petition. The petition alleged and offered to prove 16 instances of bargaining on the part of the Association, 13 of which occurred before the hearing and the remaining 3 before the oral argument. The offered evidence related to Association activities similar to those already in the record, and in that sense it was cumulative in nature. Most of this evidence existed prior to the hearing, yet no adequate reason was advanced for failure to adduce it at the hearing. The denial of the petition was not improper.

On April 5, 1940 the Company petitioned the Board for a further hearing and reconsideration of the case. The Company's petition alleged and offered to prove 15 bargaining instances occurring after the hearing, 10 of which came before the oral argument, 4 after the oral argument and before the Decision and Order, and 1 after the Decision and Order. On April 20, 1940 the Board denied the petition.

The Board found that the Company dominated or interfered with the formation of the Association and supported it. We have just reviewed that finding and conclude that it is supported by the evi-

dence. There was also some evidence that after the formation, the Association engaged in certain bargaining activities already described in this opinion. But the Board concluded that these activities did not remove the effects of the Company's unfair labor practice and that unless these effects were completely eliminated by disestablishment of the Association, the employees might not have the freedom of choice which the Act contemplates. That the Board had the right to so conclude, see the Link-Belt Co. and International Association of Machinists cases supra.

The additional evidence sought to be adduced, related to activities of the Association subsequent to the hearing. It did not pertain directly to the Company's activities, conduct and attitude and at the most tends to prove that after the hearing the Association acquired a certain measure of independence. Such evidence would not disturb the finding that during the period covered by the hearing, the Company dominated or interfered with the Association and gave support to it. Nor would it render erroneous the Board's determination that the effects of the Company's conduct can not be eliminated and the employees made entirely free without first disestablishing the Association. We believe that the refusal to consider additional evidence relating to Association activities after the hearing, was proper.

On November 8, 1940 the Company filed with this Court a motion for leave to adduce additional evidence. This motion presented substantially the same allegations of matter and offers of proof as appeared in the petition of April 5, 1940. For the reasons already pointed out in our discussion concerning that petition, the motion is denied. See also National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, 144; International Association of Machinists v. National Labor Relations Board, 71 App.D.C. 175, 110 F.2d 29, 33; Id., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. —; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 249, 250, 60 S.Ct. 203, 84 L.Ed. 219.

The order of the Board must be enforced and it is so ordered.

SPARKS, Circuit Judge (concurring).

Under the authority of National Labor Relations Board v. Link Belt Co., supra, I concur in the result reached in the main opinion.