## NATIONAL LABOR RELATIONS BOARD v. ALGOMA NET CO.
### No. 7689.

Circuit Court of Appeals, Seventh Circuit.
Dec. 9, 1941.

Robert B. Watts, of Washington, D. C., and I. S. Dorfman, of Chicago, Ill., for petitioner.

Robert C. Bassett, of Green Bay, Wis., for respondent.

Before KERNER and MINTON, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board. The Board found that the respondent, the Algoma Net Company, by interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed them by Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, had engaged in unfair labor practices within the meaning of § 8(1), and by the discriminatory discharge of 3 and the lockout of 34 employees had violated § 8(3) of the Act, 29 U.S.C.A. § 158(1, 3). Upon these findings the Board ordered respondent to cease and desist from the unfair labor practices, to reinstate the employees with back pay, and to post appropriate notices.

The Algoma Net Company is a Wisconsin corporation, engaged in the manufacture and sale of fly nets, hammocks, and related products at Algoma, Wisconsin, employing about 150 persons. During the year ending July 31, 1938, it purchased raw materials valued at $140,000 and sold finished products valued at $282,000. Approximately ninety percent in value of these raw materials and finished products came from and were shipped to points outside of the state of Wisconsin. The interstate character of respondent's business is admitted; the jurisdiction of the Board, however, is questioned on the ground that the Wisconsin Labor Relations Board assumed jurisdiction and dismissed the case before the National Labor Relations Board took or attempted to assume jurisdiction.

The record discloses that on February 8, 1939, a representative of the Wisconsin Labor Relations Board and a representative of the American Federation of Labor, hereinafter referred to as the Union, conferred with J. C. Anderegg, respondent's superintendent, to discuss charges which had been filed alleging that respondent had engaged in unfair labor practices by laying off Kaus, Ferron, and Trainor.

At a second conference on February 9, Anderegg agreed to reinstate Kaus on February 13, to reinstate Trainor and Ferron within 20 days or as soon as work was available, and to post a notice stating that respondent would not interfere in the employees' rights to self-organization. Kaus was reinstated, the notice was posted, and on February 16 Rauch, the representative of the Wisconsin Labor Relations Board, notified respondent that in view of the settlement he would recommend that the charges pending before the Wisconsin Board be withdrawn.

On February 20, respondent's manager, who had been absent from Algoma, returned. Upon receiving a report from the superintendent concerning the 3 employees, the manager directed that the 3 men be forthwith discharged and that 34 employees in Plant A be laid off until further notice. At the same time he wrote a letter to the Wisconsin Board requesting the Board to send a representative to Algoma. On February 25, Hendricks, representing the Wisconsin Board, conferred with manager E. W. Anderegg. At this conference Hendricks did not advise or request reinstatement of the 3 employees, but he did state, "I would forget about the whole thing just as if nothing had ever happened." On February 27 Plant A was reopened and the 34 employees were reinstated.

It is upon this state of the record that respondent rests its contention that the Board lacked jurisdiction. The argument is that the Wisconsin Board took jurisdiction of the case, thoroughly investigated it, and closed the matter, thereby foreclosing the jurisdiction of the National Board. In support of its contention counsel for the respondent cites, among other cases, Wisconsin Labor Relations Board v. Fred Rueping Leather Co., 228 Wis. 473, 279 N.W. 673, 117 A.L.R. 398.

In the Rueping Leather case, supra, the Wisconsin Board filed a complaint against the Leather Company charging that the defendant had violated the Wisconsin Labor Relations Act. Over defendant's objections to the jurisdiction of the Wisconsin Board, the Board considered the merits of the charges and filed findings of fact. On appeal in the Supreme Court of Wisconsin the contention was that the National Labor Relations Act applied to the defendant and covered the same ground as the Wisconsin Labor Relations Act, § 111.01 et seq., Wis. St., that it superseded the state act, and that the Wisconsin Board had no jurisdiction to enter the order which it sought to enforce. The court held that the National Labor Relations Act had not superseded the

Wisconsin Labor Relations Act, but that the Wisconsin Board and the National Board had concurrent jurisdiction over interstate commerce labor disputes in Wisconsin, and stated page 492 of 228 Wis., page 681 of 279 N.W., 117 A.L.R. 398: "With the possibility of conflict in the administration of the state and national labor relations acts, we find no occasion to deal further than to state what is obvious: That in case there is conflict in a matter properly within the scope of the national act, the state must yield. * * * We see no rea-. son to anticipate and determine when and under what circumstances the state board is ousted of jurisdiction. That question is not here under the facts of this case, * * *. When they do, it will be time enough to attack the problems they present."

■ In our case, the nature of the charges filed before the Wisconsin Board does not appear in the record. The record is equally silent as to whether any witnesses were heard and findings of fact made. Save for the letter written by Rauch in which he stated he would recommend that the charges be withdrawn and the testimony of manager Anderegg that Hendricks said "I would forget about the whole thing," no charges or disposition of the matter by the Wisconsin Board appears. Under this state of the record, we believe the National Board had jurisdiction.

We now proceed to a consideration of the merits. The respondent contends that there was no substantial evidence to support the findings of the Board. Our examination and consideration of the record has convinced us that the evidence amply sustains the finding that the respondent's coercion and interference with the union activities of its employees was a violation of § 8(1) of the Act. We pass to the question of violations of § 8(3) by discriminatory discharges.

The respondent contends that it laid off Gerald Kaus, Manuel Ferron, and Louis Trainor on February 6, because an accumulation of surplus stock in the beamer and cord department made necessary temporary adjustments in the working force. In support of this contention it emphasizes the following: that late in January and early in February, 1939, it was apparent that layoffs would be necessary; that the supply of raw materials on hand was low and that no shipments were due; that little or no yarn for nets and hammocks was available and

that this condition was reported to the foreman in charge approximately two weeks prior to February 4; that there was on hand in the cord department a large stock of material; that the customers' orders were at an extreme low and the seasonal production slump was at hand; that the plant's history indicated that this situation had occurred almost annually and had necessitated lay-offs; and that Kaus, Ferron, and Trainor had been frequently laid off for similar reasons.

Respondent also claims that these 3 employees were discharged for good cause and points to the fact that the testimony tended to prove that on the evening of February 7 Kaus and Ferron entered the boiler room of Plant "A" where they met Trainor; that Kaus, after stealing a key, entered Plant "B", demanded that employee Lumaye sign a Union application card, beat him up when he refused, and damaged respondent's goods; that Ferron entered the basement of Plant "A", invited employee Vincent away from his work and requested that Vincent join the Union; and that during these occurrences Trainor engaged night watchman Rasmussen in conversation.

■ Unquestionably the above evidence, taken by itself, does constitute grounds for lay-offs and discharge. Yet it is for the Board to determine all the facts in the case and appraise their relative weight. We shall not go into complete detail, but shall refer only to some of the circumstances upon which the Board relied. It appears that these 3 men were old and experienced employees; that on February 4 Kaus called a meeting of respondent's employees under the auspices of the Union; that Fisher, a foreman of the hammock department having power to recommend the hiring and discharging of employees, his acts being attributable to respondent (New Idea, Inc. v. National Labor Relations Board, 7 Cir., 117 F.2d 517), warned Ferron that "anybody that goes to that meeting or signs up to join the Union is fired." When Trainor returned to the plant after the meeting, Fisher stated: "It will be too bad Monday for some fellows." He also told another employee that manager E. W. Anderegg "would be angry at the union activities" and that "the fellows was liable to be discharged." Both Fisher and Anderegg denied making the statements attributed to them. Kaus, Ferron, and Trainor joined the Union and were ap-

pointed a committee to solicit members. On Monday, February 6, each was notified of his lay-off. On the following day a new man was hired and put on an operation requiring from six months' to a year's experience; during a previous slack period, Kaus had been retained and Bero, another employee, who had been retained on February 6, was laid off because Kaus was a more versatile and valuable employee. In previous years Trainor had been night foreman in the hammock department. Although Cravillion displaced Trainor, the respondent retained four junior employees who had been hired since January 15 in preference to Kaus, Ferron, and Trainor.

On the evening of February 7, Kaus and Ferron went to Plant "A". When they arrived they found Trainor there talking to the night watchman. Kaus asked the night watchman for the key to Plant "B" so that he could speak to Lumaye. Rasmussen, the night watchman, replied that the keys were lying on the water pump. Kaus took the keys and went to Plant "B" and asked Lumaye why he had not kept an appointment with him (Kaus) in the afternoon. An argument ensued during which Kaus struck Lumaye, tearing his shirt. February 8, Lumaye reported the incident to superintendent Anderegg, who advised Lumaye to "just leave it ride," and directed the respondent's chief clerk to make out a report that Kaus had been discharged for misconduct.

We have already related what occurred between February 8 and 20, and that manager Anderegg had written a letter to the Wisconsin Board. That letter was published in the local papers and a copy was posted in the plant. In this letter, among other things, manager Anderegg said:

"The writer, upon his return from a recent trip, finds that labor trouble developed during his absence, which we understand was started by an outside labor leader, and also taken part in by a member of your board.

  *       *       *       *       *

"* * * during our twenty-five years of existence this is the first labor trouble we have ever had * * *.

"We employ approximately 100 people and for a number of years now we have never asked an employee to work for us; * * * right now we have a hundred or more applications waiting for positions, * * * we never had any trouble before and wouldn't have any now if it wasn't for outsiders coming in here and meddling in our affairs.

  *       *       *       *       *

"This is the largest amount of stock ever carried by us, and we expected to carry right on * * * but if we are going to have some labor racketeer come in here and try and tear down our business, we want to know it right now * * *.

"We are closing down Plant A today, which will throw out of work about half of our employees, as we feel it is unsafe to build up further stock under present chaotic conditions, and before we resume operations we would like to have a show-down on this affair so that we know where we are at.

"* * * we are not going to let some outside element come in here and tear down our business as this stage of the game. If there is any danger of this, we are going to nip it in the bud before it starts and get our money out of this business while the getting is good."

On March 18, manager Anderegg and Kamaroff, a representative of the Board, agreed to reinstate the three discharged employees. When the men presented themselves for reinstatement they were requested to sign a statement admitting they had been discharged for misconduct. They refused to sign. Thereupon Kamaroff again spoke to Anderegg and Anderegg agreed to reinstate the men upon their promise to obey company rules. He requested that the men report to his office on March 20, but the men, not having been informed soon enough of Anderegg's request, reported to Anderegg on March 21 and were told, "It is too late now, there is no room for you fellows now." They were never rehired, although between February 20 and June 5, respondent hired 46 new employees.

█ The Board resolved the conflicts in the testimony in favor of the petitioner and from all the evidence found that by releasing Kaus, Ferron and Trainor on February 6, by discharging Kaus on February 21, and by locking out the employees in Plant "A" between February 21 and 27, 1939, respondent had discriminated in regard to their hire and tenure of employment, and that the sole ground of their discharge and lock out was their active participation in union affairs. We think there was ample evidence upon which to base the Board's finding.

Respondent makes the point that the order is invalid because it directs the respondent to cease and desist from, in any manner, violating any of the provisions of § 7 of the Act. National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. We believe the Express Publishing case is not applicable and that under the circumstances here appearing the order is valid.

We have considered all of the contentions made by respondent and find no error has intervened. The request for the enforcement of the order is granted.