**NATIONAL LABOR RELATIONS BOARD v. ECLIPSE MOULDED PRODUCTS CO.**
**No. 7848.**

Circuit Court of Appeals, Seventh Circuit.
Feb. 20, 1942.

MAJOR, Circuit Judge, dissenting in part.

Robert B. Watts and Frederick P. Mett, both of Washington, D. C., I. S. Dorfman, of Chicago, Ill., Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Louis Libbin, and David C. Sachs, all of Washington, D. C., for the National Labor Relations Board.

Michael J. Dunn, Jr., of Milwaukee, Wis., for respondent.

Before EVANS, MAJOR, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The National Labor Relations Board has filed its petition to enforce the order of the Board dated August 23, 1941. In this order it found the respondent guilty of unfair labor practices, in violation of Sections 8(1), 8(2) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(1–3). It entered an order requiring the respondent to cease and desist in its interfering, intimidating, and coercing its employees, to withdraw its support from and discontinue its recognition of the company union, and to restore the status and pay of certain employees.

The respondent is a corporation engaged in the manufacture of thermo-setting and thermo-plastic castings in Milwaukee, Wisconsin. That it is engaged in interstate commerce and that labor trouble in its plant would directly affect interstate commerce is not disputed. The respondent does challenge the jurisdiction of the National Labor Relations Board because the respondent on December 9, 1940 brought a proceeding against the Steel Workers Organizing Committee, affiliated with the Congress of Industrial Organizations (hereinafter called the Union) before the Wisconsin Employment Relations Board, charging that the strike of October 9, 1940 by the employees members of the Union was in violation of the statutes of Wisconsin in that the strike was called without a secret ballot. The Union answered and claimed unfair labor practices, substantially as claimed in the case at bar, and asked the same remedy that has been asked of and granted by the petitioner.

The complaint was served by the petitioner in the instant case on December 20, 1940, eleven days after the proceedings had been started before the Wisconsin Board. Hearings were had by the Wisconsin Board. The record does not disclose anything more as to the proceedings before the Wisconsin Board.

■ ■ The respondent contends that the jurisdiction of the Wisconsin Board and the petitioner is concurrent and the one that first took jurisdiction should hold it to the exclusion of the other. There is no basis for such contention. The National Labor Relations Board in its proceedings is administering Federal law within the sovereign limits of the Federal Government, while the Wisconsin Board is administering Wisconsin law within the sovereign limits of Wisconsin. There are two sovereignties in the same territorial area.[1]

There is not necessarily a conflict, as these two Boards operate in the same territory but in different spheres. Until conflict or interference between the two arises, there is no choice to be made as to which shall be paramount. The question of paramountcy is not determined by which one's jurisdiction was first invoked. Conflict may develop between the action of the State Board and that of the National Labor Relations Board that may require a determination of which shall be paramount. The Wisconsin Board has not asserted its paramountcy, nor has any action of it up to this point conflicted or interfered with the jurisdiction of the National Labor Relations Board. That proposition is not presented in this case. The mere filing of proceedings first in the Wisconsin Board and the pendency of the proceedings therein do not operate as a stay, or grounds for stay of proceedings in the National Labor Relations Board. The jurisdiction of the National Labor Relations Board was not ousted or interfered with by the prior filing of proceedings before the Wisconsin Board and the pendency thereof. National

---

[1] Although the Federal Courts and the State Courts had concurrent jurisdiction to enforce the Eighteenth Amendment, it was held that both the State and the Federal Courts might prosecute the same person for the same offense, notwithstanding the provision in the Constitution against double jeopardy. The law of each sovereignty had been violated. Hebert v. Louisiana, 272 U.S. 312, 47 S.Ct. 103, 71 L.Ed. 270, 48 A.L.R. 1102; United States v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314.

Labor Relations Board v. Algoma Net Co., 7 Cir., December 9, 1941, 124 F.2d 730; Wisconsin Labor Relations Board v. Fred Rueping Leather Co., 228 Wis. 473, 279 N.W. 673, 117 A.L.R. 398.

The next question is whether the Board's order is sustained by sufficient evidence. In such a case, we consider on review the sole question of whether there is substantial evidence to sustain the Board's order, and in looking to the record, we consider only such evidence as is favorable to the Board's order.

The respondent has a background that reflects positive hostility to unionism and especially toward the Union in this case.

In 1937 Armas Karjala, a molder in the respondent's plant, attended a meeting called to organize respondent's employees into a union affiliated with the International Association of Machinists. Next morning, he was summoned to the office of Eugene Engman, president of the respondent, and in his presence and that of two other company officials, Karjala was told that there was a slack season coming up and respondent was going to have to let some employees go, that they were going to keep men who were loyal, and they wanted to know if Karjala was loyal. Karjala was anxious to keep his job and assured the respondent's officials that he was loyal. Other employees who attended the meeting were summoned to the office and were told the same thing, and as a result the employees never attended any more meetings of the Machinists' Union.

Following that significant and pointed action of the respondent, one Hoge, an employee, organized the Eclipse Recreation Club. It lasted only six months and the dues were refunded. The complexion of this organization was not clear. It is significant in light of Hoge's action thereafter in organizing the independent union.

In 1939 several of the molders joined the International Molders' Union of North America and wore their union buttons in the plant. Upon observing this, the respondent's president again indicated his opposition to unions.

It was proper for the Board to consider this background of recent and uniform hostility to organizational activities in appraising the conduct of the respondent in its dealings with its employees under the circumstances involved in this case. The reflections from a background of unfairness and hostility very naturally give color to subsequent actions that must be appraised as to their fairness and good-will.

September 26, 1940, the respondent's employees held a meeting at which one Neuschaefer was elected president. On his return to the shop that day, he proudly announced to his foreman, Ralph Engman, that he had been elected president of the Union. Engman became angry, upbraiding Neuschaefer for his ingratitude, as Engman had been responsible for his employment by the respondent. Engman left immediately in the direction of the executive offices and shortly thereafter returned with the president and vice president of the company. The latter two came past Neuschaefer's machine and stopped momentarily, and then proceeded to the superintendent's office. Shortly thereafter, president Eugene Engman came out of the office, again walked past Neuschaefer's machine and left the building. He returned almost immediately and again approached Neuschaefer, at which time president Engman accused Neuschaefer of having fits and told him to close down his machine, that he would have to be examined by a doctor, and for him to return the next day for a doctor's slip.

That evening Neuschaefer, accompanied by a representative of the Union, called at the plant for the purpose of conferring with president Engman. When Mr. Engman saw them in the plant, he profanely ordered them out, threatening to call the officers of the law and to set upon them a large dog which he held on a leash.

Neuschaefer returned two days later to get his doctor's slip and was told not to set foot in the plant until his physical fitness had been determined.

Neuschaefer was examined by two physicians of his own selection and by the respondent's physician, who was also a stockholder in respondent's company. These physicians were unable to find anything wrong physically with Neuschaefer. The respondent, however, insisted that Neuschaefer be examined by another specialist to be selected by respondent. Neuschaefer declined to comply. He was finally discharged on October 11.

Seventeen of respondent's employees joined the Union at the meeting held on September 26 at the call of Neuschaefer. On the day before the meeting, Neuschaefer advised employee Gainer of the meeting and gave him a card indicating where the

580

meeting was to be held. When Gainer left work on September 26, vice president Charles Engman inquired of him: "What's the trouble around here? There seems to be something brewing, as though something is going to happen."

Gainer replied the boys were holding a meeting, and had given him a card concerning the meeting, which he turned over to Engman. The company undoubtedly had knowledge of the meeting of September 26.

On the night of September 27, Eugene Engman, president of the respondent, called a meeting of the employees on the night shift and read them a prepared statement in which he said in substance the following: "This is an American place and it is run by Americans. I hope you guys is all Americans. We can all do what we want in this here country, and you guys got the right to join any organization there is that you want to join, but I hope you do join an American one. This building here is mine, (or) I'm a shareholder in it, and I can do what I want with it. I can take it down brick by brick, tear it down or burn it up if I want to."

■ From these facts, which appear in the record, we think the Board was justified in its finding that Neuschaefer was suspended because of his Union activities, and the conduct of Eugene Engman, president, Charles Engman, vice president, and Ralph Engman, foreman, clearly indicated their open hostility to the Union and their determination to prevent its entry into respondent's plant. The violation of Section 8(1) was sustained by substantial evidence. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; Hartsell Mills v. National Labor Relations Board, 4 Cir., 111 F.2d 291; National Labor Relations Board v. Superior Tanning Co., 7 Cir., 117 F.2d 881; National Labor Relations Board v. W. A. Jones Foundry Company, 7 Cir., 123 F.2d 552; Wilson & Company v. National Labor Relations Board, 8 Cir., 123 F.2d 411; National Labor Relations Board v. Burry Biscuit Company, 7 Cir., 123 F.2d 540.

Following closely upon the suspension of Neuschaefer, the president of the newly-formed Union, and the speech of Eugene Engman to the night shift, on September 28, 1940, Hoge, the employee who had organized the Eclipse Recreation Club, drew up in the office of the plant superintendent two petitions on paper secured in the office,

for the signature of those who were interested in forming an independent union. Hoge, Greve and Scholz were very active in securing signatures on the petition. Scholz was a supervisor and Greve was a shipping clerk. Without any objection from the respondent, they were permitted to solicit, during working hours on the respondent's property, employees to join the independent union. Indeed, Hoge was given a leave of absence of several days for the purpose of organizing the independent union.

The independent union held an organization meeting October 1, 1940 and adopted a constitution and by-laws. The independent union met with respondent October 4, was promptly recognized as the bargaining agent, and notice of this fact was posted on the bulletin board. At the same time, employees were instructed by another notice posted on the bulletin board that they were not to leave their places of work during working hours to discuss matters outside the scope of their particular job, and that they would be dismissed without notice if they did.

■ We think that the open encouragement given to the organization of the independent union by permitting its organizers to solicit, on the company time and upon its property, membership in the organization; the speed with which it was organized and the promptness with which it was recognized by the respondent, coupled with respondent's hostility to the outside Union and the denial to it and the employees belonging to it of the same privileges accorded the employees in the independent union in their organizational activities, justified the Board in finding the respondent guilty of the violation of Section 8(2) of the Act in dominating and interfering with the formation of the organization of the Independent Association of Eclipse Workers. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Reynolds Wire Co., 7 Cir., 121 F.2d 627; New Idea, Inc., v. National Labor Relations Board, 7 Cir., 117 F.2d 517; National Labor Relations Board v. General Motors Corp., 7 Cir., 116 F.2d 306.

Four employees were found by the Board to have been discriminated against in their hire and tenure in violation of Section 8(3) of the Act. They were Kavel, Gehrig, Erickson and Gainer.

Kavel joined the Union on September 27. He was solicited to sign the petition

for the formation of the independent union and replied that he would think it over. Later, Hoge and Scholz approached him and asked him to join the independent union. Kavel told them he was in a hurry and started to leave, and Hoge said: "You belong to the other then." Kavel replied he did. At four o'clock the next day, October 4, he was summoned to the office of the superintendent and told that he was not making production, and he was therefore discharged. He had never had any complaints about his work up to that time. He had been in the employ of the company only since September 20.

Gehrig joined the Union September 26. He was solicited on October 2 by Scholz to join the independent union, and later he was also solicited by Hoge. Gehrig informed them he was on the fence. Hoge replied: "You might as well come clean. We know what you are." Gehrig admitted he had joined the Union. On October 8, Gehrig was instructed by his foreman to report to the superintendent, which he did, and he was advised that he was discharged, the superintendent stating at the time: "You are getting what more of them are going to get." The reasons given by the company's officials for Gehrig's discharge did not agree and were vague and confusing. One of the reasons for his discharge advanced by the superintendent was that he had not kept an accurate count of his piecework, but the evidence showed that one Perlick was the inspector who checked the piecework and his count was the one taken by the company, and not the employee's.

Erickson joined the Union on September 26. He was solicited by Hoge and Scholz to sign the petition for the formation of the independent union. He advised them he wanted to think it over. He was invited by Hoge to attend an organizational meeting, and he did attend and signed an application blank for membership in the independent union; but he did not pay the fee. On October 3 Greve asked him to pay his fee and dues, and Erickson then admitted he had joined the CIO Union. Greve approached him again later in the day but Erickson said he preferred the CIO Union to the independent union.

Erickson was off sick on October 6 and 7 and when he returned to the plant on October 8 and went to get his pay check for the previous week, Mr. Preston, the secretary, asked him how he was feeling. He replied he was not feeling very well, and although Erickson was only thirty-nine years of age, Preston said: "This is a kind of a hard job for a man about your age. It is pretty hot work. It is more for a young man, that would stand the heat." Preston told him they had decided to let him go.

As in the case of Gehrig, the testimony of the company's officials as to why Erickson was discharged is vague, confusing and not consistent. He was supposed to have been discharged because he was alleged to have broken a die, but this had happened four or five days before October 5, when he last worked, and the incident of the broken die was known to the company's officials the day it happened.

Gainer joined the Union on September 29. On September 30 his foreman asked him to join the independent union. Gainer replied he would think it over. On October 7 Scholz solicited Gainer to join the independent union and he refused. On October 7 Gainer attended a conference at the Labor Board's office as a member of the Union, and the respondent had knowledge of the meeting and of the persons who attended. On October 8 he was discharged.

The evidence shows that Karjala and Pagel were also solicited for membership in the independent union, and when they refused to join and it was found they were members of the CIO Union, they were called to the office. Both of them had attended the Union meeting of October 7 and thereafter Karjala was taken off the job he was on and placed on another job, with which he was unfamiliar. He was told he would have to make a certain production on this job and reach a certain standard or he was out. It had not been customary to shift employees from one machine to another until the job on which the machine was then working had been completed. Karjala was unable to meet the exacting requirements placed upon him on the machine to which he had been shifted, and president Engman discharged him.

While he was changing his clothes after his discharge, his foreman told him to go see president Engman in the office. Karjala went to the office and Engman indicated that he did not like the fact that Karjala had been down to the meeting that morning at the Regional Office of the petitioner. Karjala stood his ground and Engman put him back to work.

Pagel had much the same experience as Karjala. Karjala and Pagel were

old employees, and, as far as the record shows, had rendered satisfactory service. Their treatment was so obviously discriminatory and motivated by hostility toward them by reason of their activities in the Union that the company receded from its action. Nevertheless, this incident is proper for consideration by the Board in determining the guilt of the respondent of unfair labor practices engaged in by it in violation of Sections 8(1) and 8(3) of the Act.

The record shows that the Union had seventeen employees against twelve for the independent union. With Neuschaefer's suspension, it then became necessary to get rid of four more members of the Union, and there would then be a tie between the independent union and the CIO Union.

■ Kavel, Gehrig, Erickson and Gainer were all Union men, joined the Union at approximately the same time, and had relatively the same experience with reference to solicitation for membership in the independent union, their refusal to join, and their prompt dismissal. The hostility of the respondent toward the Union and the interest of the respondent in the independent union were sufficient to sustain the Board's finding that these men were discriminatorily discharged because of their Union activities rather than for the cause assigned by the respondent. Circumstances here may very reasonably be considered to support the Board's inference and to be in conflict with the rather confused and inconsistent testimony of respondent's officials as to the causes for the discharge of these employees.

The examiner found that Gainer had made untrue statements in his application for employment with the respondent and had testified in contradiction to his testimony before the Wisconsin Employment Relations Board, and he excluded Gainer from the protection of the Act. He did not discredit his testimony, and the facts surrounding Gainer's discharge are not dependent upon the testimony of Gainer nor was his discharge based upon or related to the false representations. While it is a close case as to discrimination against Gainer, we cannot say from the evidence that the Board was not warranted in the inference it drew.

We therefore hold that the respondent's discharge of Kavel, Erickson, Gehrig and Gainer was discrimination in their hire and tenure in violation of Secton 8(3) of the Act, as found by the Board. National Labor Relations Board v. Mackay Radio & T. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., February 2, 1942, 126 F.2d 452; National Labor Relations Board v. Aladdin Industries, 7 Cir., January 16, 1942, 125 F.2d 377; M. H. Ritzwoller Company v. National Labor Relations Board, 7 Cir., 114 F.2d 432; Hartsell Mills Company v. National Labor Relations Board, 4 Cir., 111 F.2d 291; Stewart Die Casting Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 849.

■ Neuschaefer's suspension and final discharge were, as the trial examiner and the Board found, discriminatory. The trial examiner recommended that Neuschaefer not be reinstated until he had submitted to and passed a physical examination by an impartial doctor. Neuschaefer had been examined by three physicians, one of whom was the company's doctor, and no physical defect appears of record. We do not think his refusal to submit to further physical examination was so unreasonable as to forfeit his right to reinstatement, and we think the Board's action in regard to him is supported by substantial evidence.

■ On October 7 the Union held a meeting and voted to strike, and on October 9, they went out on strike. The substantial evidence in the record supports the Board's finding that the strike was caused by the unfair labor practices of the respondent.

To effectuate its order, the Board entered the usual cease and desist order under Sections 8(1) and 8(2) of the Act, and directed that the respondent should withdraw recognition from and disestablish the Independent Association of Eclipse Workers as the representative of any of its employees for the purpose of collective bargaining. Respondent was ordered to offer to Kavel, Gehrig, Erickson, Gainer and Neuschaefer immediate reinstatement to their former or equivalent positions, without prejudice to their seniority and other rights and privileges, and the Board gave the usual order for back pay from the date of their discharge. Gainer and Neuschaefer were to be reinstated and back pay was awarded from the date of the discharge of Gainer and the suspension of Neuschaefer to the date of the intermediate report, and from the date of the order of the

Board to the date of the respondent's offer of reinstatement, less net earnings, etc.

As to the striking employees, the Board's order provided that respondent should offer reinstatement, upon application, to those who went out on strike and have not been reinstated. The employment offered was to be substantially the same as they held at the time of the strike, and without prejudice as to seniority and other rights and privileges; and all of those persons hired by respondent after the strike were to be discharged to provide employment for the employees to be reinstated. If such reduction in force did not supply enough jobs to reinstate all those who went out on strike, they were to be reinstated in accordance with seniority; and as to the balance, a preferential list for their employment in the future was to be established. The employees reinstated and those placed upon the preferred list were to be awarded back pay, less net earnings.

█ The order was a reasonable one, calculated to effectuate the purpose of the Board to eliminate the unfair labor practices of which the respondent had been found guilty. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; National Labor Relations Board v. General Motors, 7 Cir., 116 F.2d 306; National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799.

The case is affirmed.

MAJOR, Circuit Judge (dissenting).

I agree in the main with the conclusion that the Board is entitled to enforcement of its order. I am obliged to dissent, however, from that portion of the opinion which approves the Board's order requiring reinstatement of Floyd Gainer and Arthur Neuschaefer.

In its brief the Board states: "The question before the Board was whether the grounds advanced by respondent were genuine or mere pretext to conceal a discrimination motive." That is clearly a misapprehension of the situation as I understand it. The burden was on the Board to prove the charge which it had made and the question before the Board and here is whether such charge is substantially supported. As to these two employees, the Board is forced to rely largely upon its inference arising from the fact that respondent had evidenced hostility toward the Union and partiality toward the Independent. The word "inference," notwithstanding the recent rapid development of its stature, is not sufficiently elastic to include either a guess or suspicion.

Gainer was employed and commenced work as a moulder in respondent's plant on September 12, 1940. Previously, he had filled out an application card in which he stated he was married and had several children; that he was a moulder by occupation and was an industrial chemist, all of which, as he admitted at the hearing, was false. In his application he also stated that he had left his previous employment of his own accord, contrary to the fact that he had been discharged by his previous employer. Previously, at a hearing before the Wisconsin Employment Relations Board, he had given testimony concerning matters material to the instant proceeding, which was at variance with his testimony before the Board. Of this witness, the Examiner, in his intermediate report, stated: " * * * The record conclusively shows, however, that Gainer falsified his application for employment with the respondent; and at the hearing was an untruthful and unreliable witness giving testimony on material issues at variance with his testimony before the Wisconsin Employment Relations Board. In view of these factors, the undersigned will not recommend his reinstatement."

Gainer was discharged on October 8, 1940, less than four weeks after his employment. It is true, in the meantime he had joined the Union. It is conclusively shown, however, as pointed out by the Examiner, that he obtained his employment by inexcusable misrepresentations. I think there is no question but that respondent had a right to discharge him at any time after learning of the fraudulent manner in which it had been induced to accept him as an employee. In addition, his work was not satisfactory, due perhaps to the fact that he was inexperienced as a moulder. If he had been experienced, as he represented, the situation in this respect might have been different. Notwithstanding that respondent had a valid reason for Gainer's discharge, which was of Gainer's own creation, the Board indulges in the unreasonable inference that respondent adopted an

unlawful means for his dismissal. To me this inference does violence to common sense and should not be indulged in.

Neuschaefer was another short-time employee. He signed an application card on August 20, 1940, and was discharged October 11, 1940, for failure to submit to a medical examination. In the meantime he had become President of the Union. He was put to work on a moulding press which operated under high temperatures. On September 18, after working two and one-half hours, he became ill and was forced to leave the plant. According to his own testimony, he had burned himself several times during the few days he worked. Also, he had had one or two dizzy spells and was advised to see a doctor. He was told that respondent would pay for an examination. The circumstance is aptly described by Neuschaefer himself:

"Q. In fact, he (respondent's official) told you you would be continued on the payroll until they had the doctor's report, and could study it? A. That's right.

"Q. And he also told you if this doctor said you were all right, that you might come back to work? A. That's right.

"Q. In fact, it seems to me you said he told you you would be put back to work, if the doctor said so? A. Provided the doctor's report was satisfactory.

"Q. Didn't he tell you that if the doctor's report was favorable, you would be put right back to work in the plant? A. Yes, if the doctor's report was favorable. That's the very words he said."

As pointed out, he was examined by respondent's physician and by two physicians of his own choosing. In the meantime there had also come to respondent's notice, the fact that Neuschaefer had, in 1936, suffered a severe skull fracture and brain concussion and had been advised by his physician to rest and avoid heat. On October 2, 1940, respondent advised Neuschaefer in the presence of a Union representative that it desired an examination by a specialist, and that Neuschaefer would be carried on the payroll until such examination was made. It was then agreed that a Doctor McCormick, an eye, ear, nose and throat specialist, should make the examination. At the hearing the Union representa-

tive admitted that Neuschaefer was told by respondent that he would be put back to work if Doctor McCormick found him physically all right. After having agreed to submit to such examination, he refused to do so on the advice of Union officials. That there was a serious question regarding his physical condition can not be doubted. The Examiner appraised the situation thus: " * * * and in view of the fact that the record does not clearly indicate Neuschaefer's true condition, the undersigned will not recommend that the respondent reinstate Neuschaefer until he passes a physical examination conducted by an impartial and licensed doctor. * * *"

The Examiner also made what I think was a proper recommendation that the parties agree upon a doctor to make the examination, and that if they were unable to agree, a doctor be designated by the Regional Director of the Labor Board. He was kept on respondent's payroll from September 28, the day he became ill, until October 11, when he refused to submit to an examination by Doctor McCormick.

In my opinion, respondent had ample justification for its request in this respect —in fact, it would have been derelict in its duty had it done otherwise, both for the welfare of Neuschaefer and his fellow employees. The most logical inference to be drawn from all the circumstances, and the one which stands out above all others, is that Neuschaefer, aware of his unfit condition, was afraid it would be discovered by the doctor and, for that reason, refused to submit to the examination to which he had agreed. In addition, Neuschaefer admitted at the hearing that respondent's president told him that he did not care what organization he belonged to, and that his Union membership had nothing to do with sending him to the doctor. Notwithstanding this situation, the Board finds that his leadership in the Union was the reason for his discharge and that his refusal to submit to an examination was merely a pretext. So respondent is ordered to reinstate him to his former employment regardless of the hazard incident thereto, and this without an inquiry as to his physical condition. In my opinion such an order is not justified by the record.