RAY-O-VAC COMPANY, Appellant, vs. WISCONSIN EMPLOY-
MENT RELATIONS BOARD and others, Respondents.
(PETITION OF INTERNATIONAL ASSOCIATION OF MA-
CHINISTS, LODGE No. 1406, A. F. L.)

*May 23—June 22, 1946.*

For the appellant there was a brief by *Schubring, Ryan, Petersen & Sutherland,* and oral argument by *Ralph E. Axley,* all of Madison.

For the respondent Wisconsin Employment Relations Board there was a brief by the *Attorney General* and *Beatrice Lampert,* assistant attorney general, and oral argument by *Mrs. Lampert.*

*Mr. George Gratz* of Milwaukee, for the Machinists' Union.

FRITZ, J. Ray-O-Vac Company (hereinafter referred to as the "company") is a corporation engaged in the production of batteries at Madison, Wisconsin. Since 1937 it engaged in collective bargaining with Federal Labor Union No. 19587, A. F. L. (hereinafter referred to as the "Federal Union"), as the representative for most of the company's employees, excepting the employees of its experimental toolroom, who have not in the past been represented by any collective-bargaining agent. Shortly prior to February 15, 1945, the company and the Federal Union entered into a contract for the period from February 15, 1945, to February 15, 1946, and before this contract was signed, that union notified the company that certain employees

previously represented by that union desired to transfer to the International Association of Machinists, Lodge No. 1406, A. F. L. (hereinafter referred to as the "Machinists' Union"), and that the Federal Union desired to release such employees to the Machinists' Union. Those unions had agreed that that group of employees should be classified as machinists so as to be subject to the jurisdiction of the Machinists' Union. The group included employees of the company's toolroom, experimental toolroom, and maintenance department, excepting foremen, who would in any event be excluded from the definition of employees in sec. 111.02 (3), Stats., and also excepting firemen and oilers, who were recognized as not belonging to the machinists' craft. The employer declined to defer the signing of the contract so as to exclude the employees covered by that agreement of the·two unions.

On June 5, 1945, the Machinists' Union petitioned the Wisconsin Employment Relations Board (hereinafter referred to as the "board") alleging that all employees in the toolroom, maintenance department, and experimental toolroom, excepting the foremen, and firemen and oilers, constitute an appropriate collective-bargaining unit or units; that no individuals or labor organizations claimed to represent the employees in such unit; that they were previously negotiated for by the Federal Union, but have voluntarily transferred to the Machinists' Union because they are working under its jurisdiction; and that the company had notice that those employees were members of the Machinists' Union, but the company had refused, after such notice, to negotiate an agreement with them. At a hearing on June 14, 1945, pursuant to its petition, the Machinists' Union claimed that the unit proposed was an appropriate one, and it was stated on behalf of the Federal Union that in accordance with the laws of the American Federation of Labor, which provide that craftsmen who perform work, which, under

the federation's constitution definitely falls within the juris-diction of an international union, such workers are to be released by the Federal Union to the craft unions; and that the Federal Union had so released such employees and given them withdrawal cards, and they were claiming a craft unit. On behalf of the company it was stated that it has not been concerned with what unions represent its employees, but it is concerned as to how many unions repre-sent the employees; and the company claimed the group proposed did not meet any of the statutory requirements of persons who may have a separate bargaining unit or an election for a separate bargaining unit under the Wisconsin law; and that it is neither a division of the company, a single department, nor a single craft.

In relation to those matters there was considerable testi-mony taken at a hearing, and upon this testimony the board made a memorandum decision in which it stated,—

"Clearly, the employees included within the collective-bargaining unit attempted to be set up by the petitioning Machinists' Union do not constitute a separate division, department, or plant of the employer. Under the statute, if they are to constitute a separate collective-bargaining unit, it must be on the basis that these employees constitute a separate craft and as such are entitled to bargain as a separate collective-bargaining unit if a majority of them so desire. Recognition by the Federal Labor Union, which in the past has represented these employees, of the fact that all these employees are members of a single craft properly within the jurisdiction of the petitioning union is strong evidence that these employees constitute such a craft. No local union having an all-union shop agreement will voluntarily release employees subject to such agreement unless con-vinced that under the laws of their organization they are re-quired to do so. Unless the Federal Labor Union in this case was convinced that these employees, and all of them, be-long to a *craft* over which the Machinists' Union had jurisdic-tion, they would, without question, have refused to release

these employees from the necessity of continuing membership in their organization as required by their all-union shop agreement. Upon the basis of the action of these unions and the testimony before us, we have come to the conclusion that these employees *constitute a separate craft.* Section 111.05 of the statutes provides that employees in a separate craft are entitled to an opportunity to determine at an election whether they desire to bargain with their employer as a separate collective-bargaining unit and who, if anyone, they desire to have represent them for such purpose. Finding that these employees constitute a separate craft requires us to conduct an election to determine such questions and certify the result to the employer."

Upon that determination the board directed an election to be conducted on November 6, 1945, among all employees employed on June 15, 1945, in the company's toolroom, in the experimental toolroom, and in the maintenance department of the company, excluding firemen, oilers, and supervisory employees, for the purpose of determining whether they desired to constitute themselves a separate unit for the purposes of collective bargaining; and whether or not they desired to be represented for such purposes by the Machinists' Union. On November 15, 1945, the board issued a "Certification of Representatives," in which it recited that the board having found that the results of the election were that out of thirty-two employees eligible to vote twenty-three had voted in favor of having all employees in the toolroom, the experimental toolroom, and the maintenance department, excluding firemen, oilers, and supervisory employees, bargain collectively as a separate unit; and that twenty-two employees had voted that they desired to be represented for the purposes of collective bargaining by the International Association of Machinists' Union; therefore the board by virtue of the power vested in it by sec. 111.05 (2) and (3), Stats., certified that said employees, excluding firemen, oilers, and supervisory em-

ployees, chose to constitute themselves a separate bargaining unit; that the Machinists' Union has been selected by a majority of the eligible employees in said bargaining unit, who voted at said election, as their representative for the purposes of collective bargaining; and that pursuant to the provisions of sec. 111.05, Stats., the Machinists' Union is the exclusive bargaining representative of all such employees for the purposes of collective bargaining with respect to rates of pay, wages, hours, and other conditions of employment.

The company alleged in its petition for a review of that decision and certification by the board,—so far as material to its contentions on this appeal,—that the "Certification of Representatives" by the board is in excess of its statutory authority and jurisdiction for the reason that it was made as the result of an election of employees who did not and could not constitute one of the appropriate groups entitled under ch. 111, Stats., to constitute themselves a separate collective-bargaining unit because it appears, without contradiction, that the employees requesting such an election and certification do not constitute all of the employees of the company engaged in a single craft, division, department, or plant, and that not all of the employees included in the group so certified were of a single craft as a matter of fact. And upon the review in the circuit court the company's attack was, as the court said in its decision,—

"primarily lodged against . . . the board's finding of what constitutes a single craft. In the instant case the question is what employees of appellant constitute the machinists' craft. Appellant contends that the board included employees who in no sense could be considered machinists, and excluded others who might be properly considered as machinists. This is clearly a question of fact. The same rule is applicable to the board's findings in the instant case as is found under the Workmen's Compensation Act. The rule in brief is that such findings 'if supported by evidence

in a record' shall be conclusive. . . . Viewed in the light of this rule the court has carefully examined the record. While to the lay mind of this court, it appears that at least one carpenter and one electrician should not have been included in a machinists' craft, nevertheless, for reasons hereinafter stated, the board's findings are proper and are sustained by the evidence. It may be that the board included these two employees because they were found, and belonged to the maintenance department of the appellant plant. Moreover, in the declaration of the policy of the act the legislature has recognized that there are three major interests involved in labor-management disputes, namely: That of the public, the employee, and the employer. Since these interests are to a considerable extent interrelated, it is the policy of the state to protect and promote each of these interests, with due regard to the situation and the rights of others. Section 111.01 (1). To carry out such a declaration of policy the board must necessarily be vested with broad powers, and must be permitted to exercise a sound judgment and discretion. The solution of the question as to what constitutes a proper collective-bargaining unit under section 111.02 (6) must necessarily involve the exercise of judgment and discretion."

On this appeal the company contends the group of employees proposed to be included in the collective-bargaining unit did not constitute a separate "collective-bargaining unit" within the meaning of that term as defined in the provision in sec. 111.02 (6), Stats., that,—

"The term 'collective-bargaining unit' shall mean all of the employees of one employer (employed within the state), except that where a majority of such employees engaged in a single craft, division, department or plant shall have voted by secret ballot as provided in section 111.05 (2) to constitute such group a separate bargaining unit they shall be so considered. . . ."

And the company contends the board erred in concluding that the group of employees in question were within that

definition of a "collective-bargaining unit" because, as the board concluded, "these employees constitute a separate craft." The company claims they did not constitute a separate craft and were not engaged in a single craft because in addition to machinists there were in the group millwrights, carpenters, electricians, pipe fitters, welders, a blacksmith, painters, and a number of unskilled handy men who might be helpers in various of these crafts.

On the other hand, it is contended on behalf of the board that the term "craft" as used in sec. 111.02 (6), Stats., was intended to comprehend any group of skilled workers whose functions have common characteristics distinguishing them sufficiently from others so as to give such group separate problems as to working conditions for which they might desire a separate bargaining agent; that the evidence before the board was sufficient to support finding that the group of employees in question in the toolroom, the experimental toolroom, and the maintenance department, constitute a single craft; and that on a review of the board's findings, the court has no jurisdiction to determine the factual issues anew if there is some evidence before the board reasonably tending to support a finding, and "the court may not weigh the evidence to ascertain whether it preponderates in favor of the finding" (*Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 494, 279 N. W. 673) ; or substitute its judgment for that of the board even though the court might have decided the question differently had it been before the court *de novo*.

Those contentions on behalf of the board must be sustained. In relation to a court review of the board's findings and orders it must be noted that there is applicable thereto, since the enactment of ch. 375, Laws of 1943, the provision in sec. 227.20 (2), Stats., that,—

"Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of

the agency involved, as well as discretionary authority conferred upon it."

The word "craft," which is in sec. 111.02 (6), Stats., is defined in Webster's New International Dictionary (2d ed.) as follows:

"a. Art or skill; dexterity, as in some manual employment; aptitude; skillfulness in planning or executing. . . .

"b. An occupation or employment requiring this; a manual art; a trade, business, or profession. . . .

"c. Those engaged in any trade, taken collectively; a guild; as, the *craft* of ironmongers."

In 10 Words and Phrases, p. 322, there is the following comment under the subject "craft,"—

"Technically, a 'labor union or organization' is generally composed of members of 'craft,' which is trade or occupation of kind requiring skill and training, particularly manual skill combined with knowledge of principles of art, and also body of persons pursuing such calling. *Cole v. Commonwealth,* 193 S. E. 517, 519, 169 Va. 868."

Our review of the proof taken at the hearing before the board discloses that there was evidence which reasonably tended to support and warranted the board in considering that there were thereby established facts to the following effect. All of the employees included in the group in question are employed in three departments designated by the company as the machine shop or toolroom, the maintenance department, and the experimental toolroom,—designations by the employer which are in themselves significant as to their functions,—and the primary functions of those employees are to perform skilled services in connection with the erection, maintenance, repair, and change-over of machinery used for the production of batteries. The work of the three departments is carried on under supervisors separate from the company's other departments, and the three are

under the jurisdiction of a superintendent called a works engineer, who supervises no other departments; and the jurisdiction of the vice-president in charge of production involves these departments only "indirectly." The departmental workrooms of those three departments are all physically separated from other departments, and the employees in question rarely, if ever, make products intended for use outside the plant. The major functions of the machine shop or toolroom employees are to make and replace or install parts for the repair and change-over of production machinery. Approximately half of their time is spent in making machine parts and the other half in replacing the parts into the production machinery, either for repair or for change-overs. When making parts, these employees work in the toolroom although they also work on the production floor when they are doing repair work and substituting parts in the production machinery. The main functions of the maintenance-department employees are to see that the machinery and equipment are kept in repair so that the production end of the plant is kept up. They handle the conveyors for change-overs; also make parts for the machines when change-overs take place, and alter piping for change-overs and make new connections where necessary. In the experimental department laboratory the employees make the machinery, equipment, and gadgets necessary to manufacture new types of cells and to run tests on them. In the machine shop of the toolroom and the machine shop there is practically only one all-round machinist. There are machinists, but not all-round,—they specialize. When an employee is first "upgraded" from the production department to the toolroom or maintenance department, he probably cannot operate the machines for making of parts, but would at the beginning be among the group whose specialty is repair of production machinery, and who as specialists on certain machines "go into the shop to make repairs." These "specialists," after

transfer into the toolroom or maintenance department, learn to operate the machines in those departments (as distinguished from production machinery) under the supervision of their departmental foremen. A transfer from the production department to any of the jobs of the employees in the group constituted an upgrading based on the specialized knowledge or ability of the employee in connection with maintenance and repair of machinery, and further training for specialization is involved after such a transfer, and when it has been made, the employee is retained on the higher ranking job and no longer used for production work. Some of the men in the course of their machine-maintenance work perform such functions as painting, pipe fitting, welding, and the work of carpenters and electricians, but only as an incident to the erection, maintenance, repair, and change-over of production machinery; and these incidental duties do not characterize the primary nature of their classification. Two employees did so-called carpentry work, but they did not spend their entire time in that type of work, and there is only one employee who could be classified as an electrician's helper. One foreman was an electrician, but he was excluded from the unit by the statutory definition of an employee and by the board's finding. None of the employees in question are engaged in either general electrical work or carpentry, as those terms are understood in the building trades, and such carpentry work as they do is not general construction work, but specialized service in connection with the erection, maintenance, and change-over of production machinery and equipment. One of them spends fifty per cent and the other about ten per cent of the time "on some other little gadgets." The electrical work consists of electrical wiring, revision in the wiring, and work and repairs on motors and changing them or running down any breakdown that affects some particular production operation. As to the employees in the group in question, it was determined by agreement between the Fed-

eral Union and the Machinists' Union that they are all subject to the jurisdiction of the craft union, and there are no other employees in the plant who are; and that the group in the craft union includes all of the employees doing the same kind of work, excepting that there are foremen employed in production, who are able to maintain and repair machines, but that as such foremen are persons working in a supervisory capacity they are not employees under the definition in sec. 111.02 (3), Stats., and therefore cannot be included by the board in a bargaining unit. Moreover, the occasional assistance or presence of a production employee at isolated change-over operations does not necessarily characterize him as one who should have been included as one of the employees in the group in question.

In view of the evidence as to the above-stated facts, the board was warranted in concluding that all of the work performed by the employees in question in the company's toolroom, experimental toolroom, and maintenance department,—even though they do not all engage in identical operations,—is for the common purposes of maintaining, erecting, repairing, and change-overs of the company's production machinery; and as all of their work requires some specialized knowledge, ability, aptitude, and manual skill and training in order to effectuate those purposes by their co-ordinated operations that group of employees are engaged in, and can be deemed to constitute, a "single craft," within the meaning of that term as used in sec. 111.02 (6), Stats., and the above-quoted definition of the word "craft." Consequently the board could rightly conclude,—as it did,—that the employees in that group constituted a separate craft, and that as such they were entitled to determine at an election whether they desired to have a separate bargaining unit.

*By the Court.*—Judgment affirmed.

RECTOR, J., took no part.